12607

GREEN *ET AL.* v. CITY OF ROCK HILL *ET AL.*

(147 S. E., 346)

238

240

244

*Messrs. Wilson & Wilson,* for petitioners,

*Messrs. Spencer & White,* for respondents,

*Rose & Paskus,* and *J. H. Marion,* also for respondents.

February 27, 1929.

The opinion of the Court was delivered by MR. JUSTICE STABLER.

This is a proceeding for injunctive relief in the original jurisdiction of the Court, instituted by the petitioners, as inhabitants, citizens, freeholders, and taxpayers of the City of Rock Hill, on behalf of themselves and all others in like situation, having or claiming an interest in the subject-matter of the action, against the City of Rock Hill, its City Council, and the Rock Hill Printing & Finishing Company, a private business corporation.

·Upon the verified petition, a rule was issued by Hon. R. C. Watts, Chief Justice, requiring the respondents to show cause before this Court at its regular session on January 14, 1929, why the permanent injunction prayed for should not be granted. The respondents duly made return to the rule, and by their answers admit all allegations of fact contained in the petition, deny and traverse all the conclusions of law stated therein, and allege by way of further defense certain facts about which the controversy has arisen. The petitioners demurred to the answers of the respondents, upon the ground that they do not state facts sufficient to constitute a defense to the causes of action set out in the petition.

Two causes of action are pleaded. The first is, in substance, that the respondent, City of Rock Hill, as party of the first part, acting by and through its City Council, and the respondent the Rock Hill Printing & Finishing Company, as party of the second part, have entered into a certain contract, whereby it is provided that the city shall build and construct an additional water supply system, which shall be managed, operated, and maintained by the Rock Hill Printing & Finishing Company for and over a period of 49 years, which term may be extended for a like period, upon certain conditions and subject to certain terms, restrictions, and requirements particularly set up in the contract; that the contract is invalid, in that it is *ultra vires* and contrary to public policy; and that the respondents intend and have taken appropriate steps to comply with the contract, to the irreparable injury of the petitioners and all others in like situation. For a second cause of action, it is alleged, in substance, that the City of Rock Hill has authorized and proposes to sell a certain issue of water works improvement bonds; that such proposed action is illegal, in that the City Council is without authority in the premises; and that such action on the part of the City will result in irreparable injury to the petitioners and all others in like situation with them.

Two broad issues of law, so raised, together with the particular contentions made by the petitioners under each

issue, will be considered in the order stated. We have practically adopted the carefully prepared argument of counsel for the respondents as the opinion of the Court.

*As to the validity of the contracts:* From the allegations and admissions of the pleadings it appears that on November 28, 1928, the City of Rock Hill, hereinafter referred to as the "City," and the Rock Hill Printing & Finishing Company, hereinafter referred to as the "Company," entered into an agreement in writing, which we shall hereinafter refer to as the "preliminary agreement," whereby it was provided that upon the fulfillment of certain conditions therein set out the City and the Company would make and execute the contract, designated in the record as "Exhibit A" of the preliminary agreement. This proposed contract is the one which petitioners seek to have declared invalid, and which will be hereinafter referred to as the "Contract." Conformably to one of the conditions of the preliminary agreement, pursuant to a petition signed by a majority of the freeholders of the City, as shown by its tax books, an election was duly ordered, called, and held for the purpose of submitting to the qualified electors of the municipality the question of ratifying and approving the terms and provisions of the contract, whereby a certain addition to the City's water system would be conveyed and disposed of, subject to the terms and conditions of the contract, to the Rock Hill Printing & Finishing Company. At this election the votes of all electors voting were cast in favor of the ratification and approval of the contract. Thereupon the City, pursuant to the contractual obligation assumed by it in the preliminary agreement, being about to make and execute the contract ratified by the electorate, and to proceed with the performance thereof, petitioners brought this proceeding to enjoin the City upon the ground, substantially, that the making and performance of the contract on its part would be *ultra vires* and contrary to public policy.

The contract is somewhat lengthy and elaborate, covering many matters of administrative detail, and containing

numerous provisions directed to the safeguarding of the respective rights and interests of the parties against various contingencies and in various situations likely to arise during and over a long period of years. On the date of the execution of the preliminary agreement, November 28, 1928, the City Council adopted the following resolution:

"Whereas the City Council, on behalf of the City of Rock Hill, is now entering into a Contract with the Rock Hill Printing & Finishing Company, whereby it is stipulated and agreed that the City of Rock Hill shall construct an addition to its municipal waterworks system of the character and extent described in said contract, and that said addition to its water works system shall after construction be manged and operated by said Rock Hill Printing & Finishing Company upon the terms and conditions provided in the said Contract; and whereas, the subject-matter of the said Contract, including the specific terms thereof, has been given the careful and deliberate investigation and consideration of the City Council—nor be it:

"Resolved, by the City Council, in meeting duly assembled, acting in both its legislative and judicial capacities, that it finds the following facts:

"(1) That the supply of water provided by the existing municipal water supply system is inadequate and that the construction of the proposed addition to the city's water system including ground and elevated storage reservoirs and filter plant, is necessary to [in] the public interest to meet the present and future needs of the city and its inhabitants and freeholders.

"(2) That as a business proposition, by virtue of the construction and disposal of said proposed addition to its water works system to, and the operation thereof by, the said Rock Hill Printing & Finishing Company upon the terms and in accordance with the conditions of said contract, the city and its inhabitants and freeholders thereby secure, and will be provided with, an adequate supply of water rea-

sonably commensurate with the investment involved at a cost for operation and maintenance which is financially advantageous to the city."

Certain other more or less relevant facts, as established by the allegations and admissions of the pleadings, may be more appropriately stated in immediate connection with the particular contention of the petitioners which will now be considered and discussed.

The first contention advanced by petitioners is that "under the general statute law of the State (Sections 4431, 4432, etc., Vol. 3, Code of Laws 1922) the exclusive management of the waterworks of the city and all rights and powers with respect to the construction, improvement, and operation thereof, are vested, or mandatorily required to be vested, in a board of commissioners of public works, and not in the City Council of said City." It is admitted in the brief of counsel for petitioners that under the provisions of an Act of the General Assembly, duly enacted at the regular session of 1914, entitled "An Act to amend an Act entitled 'An Act to regulate the holding of elections for commission form of government * *. *' by providing for an election thereunder and the adoption of said form of government in the City of Rock Hill, South Carolina" (28 St. at Large, p. 573), the City of Rock Hill by vote of its electors duly adopted a form of government therein established and has ever since been and is now operating under such commission form of government.

Section 2 of this Act, hereinafter referred to as the "Act of 1914," provides "that upon the adoption of either form of commission government and the election of the councilmen thereunder, the duties and powers of the board of commissioners of public works in said City shall thereupon be devolved on the City Council and the said board of commissioners of public works thereby abolished." The Act of 1914 was amended by an Act, ratified March 4, 1921 (32 St. at Large, 751), which did not affect the provision of the

Act of 1914 abolishing the board of commissioners of public works. Petitioners predicate the lack of authority of the present City Council of said City, duly so constituted pursuant to the provisions of the Acts above referred to, to contract in the matter of the proposed addition to the water supply system upon the fact that the Act of 1914, as amended, providing for the adoption of the commission form of government in the City of Rock Hill and for the abolishment of the board of public works in said City, was not embraced in the Code of 1922.

It appears that so much of the Act of 1914 as provides for the abolishment of the board of public works in the City of Rock Hill and the devolution of the powers and duties of such board upon the City Council is not incorporated as a special provision in the general statute (Section 4431, Code of 1922), which provides for the election of commissioners of public works at any "election for bonds," which bonds towns and cities are authorized to issue for the construction and operation of waterworks, etc., under Section 4430, Volume 3, Code of 1922, although the provisions of similar amendatory Acts abolishing the board of commissioners of public works in a number of the other towns and cities of the State are so included and set forth by way of proviso in said Section 4431 of the Code. Nor is the Act of 1921 incorporated in Article 8 of Chapter LI of Volume 3, Code of 1922, relating to the adoption of the commission form of government in certain cities. It must be conceded that the effect of the failure of the codifiers to incorporate in the Code of 1922 the Act of 1914, as amended, was to render that Act, as amended, inoperative after the effective date of the adoption of the Code of 1922. *State v. Meares,* 148 S. C., 118; 145 S. E., 695.

In this connection, by written stipulation of counsel for the parties filed as a part of the record, it is agreed that this Court shall consider certain Acts of the General Assembly of South Carolina, ratified as Nos. 97, 98, 100, 101 and 102,

February 8, 1929, during the pendency of this proceeding. An examination of these Acts discloses that they were intended to cure the inoperative status of the Act of 1914, as amended, and were especially and expressly directed to the purpose of reenacting such inoperative statutes, with retroactive effect, and of validating the Acts of the City of Rock Hill taken during the period of time the statutes were so rendered inoperative.

The Acts of February 8, 1929, of which this Court takes judicial notice, are plainly curative and remedial in character, and are clearly applicable to the pending controversy, in which no final judgment has been rendered. See note, 25 A. L. R., 1136. It is a well-settled general rule that the Legislature, by a curative or validating statute which is necessarily retrospective in character and retroactive in effect, can "validate any Act which it might originally have authorized." *State v. Whitesides,* 30 S. C., 579, 9 S. E., 661, 3 L. R. A., 777; *State v. Neely,* 30 S. C., 587, 9 S. E., 664, 3 L. R. A., 672; *Hodge v. School District,* 80 S. C., 518, 61 S. E., 1009; *Dove v. Kirkland,* 92 S. C., 313, 75 S. E., 503; *Lucas v. Barringer,* 120 S. C., 68, 112 S. E., 746. Obviously, the General Assembly possessed the same powers to reenact, with retroactive effect, the Act of 1914, and the Act of 1921 amendatory thereof, that it had to enact the said statutes originally.

It is not contended that these Acts as originally enacted were invalid. If, however, they were unconstitutional, in that they infringed the constitutional provisions against special legislation, there can be no doubt that the organization thereunder of the municipal government of Rock Hill constituted the municipality a municipal corporation *de facto,* and the members of its City Council *de facto* officers of the corporation. But that situation, under the well-settled rule, the validity of the proceedings under which the municipal government of the City was established, or the acts of its *de facto* officers, cannot be attacked in this

proceeding. 19 R. C. L., 703; 43 C. J., 170; *State v. Miller,* 122 S. C., 468, 115 S. E., 742; *State v. Neely,* 30 S. C., 587, 9 S. E., 664, 3 L. R. A., 672; *State v. Coleman,* 54 S. C., 282, 32 S. E., 406; *McBee v. Hoke,* 2 Spears, 138; *Kottman v. Ayer,* 3 Strob., 92; *Taylor v. Skrine,* 2 Tread. Const., 696.

If, as follows, by virtue of these curative acts, the City Council of the City of Rock Hill is, and was at the time of entering into the agreement to make the contract here in question, vested with authority conferred upon the board of commissioners of public works by the general statute (Section 4432, Vol. 3, Code of 1922), to "build or contract for building" waterworks, "to operate the same," and to have "full control and management of same," petitioners' first contention that the contract should be declared invalid upon the ground that the subject-matter thereof is within the scope of statutory powers conferred upon the board of commissioners of public works, and not upon the City Council, must be overruled.

Proceeding to a consideration of the remaining contentions of petitioners in the light of the Acts of the General Assembly ratified February 8, 1929, we think it is clear that if, under the applicable general statutory law of the State in force at the time the City Council of Rock Hill agreed to enter into the said contract, the City of Rock Hill was authorized and empowered, through its duly constituted City Council, to enter into and perform this contract, there can be no valid objection from any point of view to giving full force and effect to the validating statutes; that is, for the purpose of applying the controlling principle that a curative statute is valid, where the Legislature originally had authority to confer the power or to authorize the Act confirmed, no question can arise as to the power of the Legislature, consistently with constitutional inhibitions against special legislation, originally to have authorized the making of the contract here in question, if under the valid general statutory law of the State municipality of Rock Hill was at the time

of the making of the contract clothed with ample authority in the premises, in so far as a legislative grant of power was essential to the validity of such contract. The several remaining contentions of the petitioners will therefore be examined and passed upon in the light of the applicable general statutory law of the State in force at the time the City Council of Rock Hill agreed to enter into the contract.

In the interest of a logical discussion of the broad contention made that this contract is invalid, because *ultra vires* and contrary to public policy, the next specific contention of petitioners which will be considered is that the contract "contemplates and involves the exercise of the taxing power of the said City of Rock Hill, and the use of public funds raised thereby, for a purpose which is essentially private, improper, and illegal, to wit, for the purpose of leasing public property upon terms which are tantamount to the payment of a subsidy out of public funds to a private business corporation as a financial inducement to such corporation to locate, construct, and operate a manufacturing plant in the said city." Succinctly stated, the contention is that the contract involves for its fulfillment the exercise of the power of taxation for a purpose which is essentially private and not public in its nature. If so, it would, of course, be invalid. As was said by this Court in the case of *Haesloop v. City Council of Charleston*, 123 S. C., 272, 285, 115 S. E., 596, 601:

"For reasons of sound public policy, unreservedly approved by this Court, it has been uniformly held in this and in other jurisdictions that municipal corporations have no power to enter into contracts of any kind that involve for their fulfillment the exercise of the dangerous power of taxation where the object to be subserved is not essentially 'public' in its nature. It is true that what is a 'public purpose' in this sense is a question as complex as the social life of the modern urban community. For illustrative views of our own Court as to what will constitute a public purpose,

within the meaning of the right to tax, see *Feldman v. City Council of Charleston,* 23 S. C., 57, 55 Am. Rep., 6 (denying the right to issue bonds to assist private individuals in rebuilding after a fire); *State ex rel. James Copes v. Mayor, etc., of Charleston,* 10 Rich., 491 (upholding the right to subscribe to a railroad outside the State); *State v. Whitesides,* 30 S. C., 579, 9 S. E., 661, 3 L. R. A., 777; *State v. Neely,* 30 S. C., 587, 9 S. E., 664, 3 L. R. A., 672 (railroads); *Allen v. Adams,* 66 S. C., 344, 44 S. E., 938 (schoolhouse not to be used or controlled by the municipal authorities, a public or corporate purpose). In ascertaining what is a public purpose, within the power to tax, such benefits from a proposed expenditure as will accrue from increased taxable values, from enhancement of property values generally, and from increased impetus to the commercial life of the community, will ordinarily be considered of too incidental or secondary a character to justify an outlaw of public funds. *Feldman v. Charleston, supra; Citizens' Sav., etc., Ass'n v. Topeka,* 20 Wall., 655, 22 L. Ed., 455."

But, fairly construed in the light of the admitted facts, we think this contract in no wise contravenes the foregoing well-settled principles of law. Both in form and substance the contract is essentially an operative agreement—wherein and whereby the City undertakes to provide for the operation, management, and maintenance of an additional water supply system after construction. To the extent that the contract, *prima facie,* involves the exercise of the power of taxation by the City that power is to be exercised for the purpose of constructing and operating an additional water system by and for the City—"a public purpose within the power to tax," which is expressly recognized and sanctioned both by statute and in the fundamental law of the State. Section 5, Art. 8, of the Constitution of 1895, provides that "cities and towns may acquire, by construction or purchase, and may operate, waterworks," etc. By virtue of that provision it is clear that the Legislature of the State

could not, if it would, withhold or withdraw from cities and towns the right to exercise the power of taxation for the purpose of "constructing" and "operating" waterworks. The contract recites that "the city is about to build and contract a water supply system" of a certain character, and that the fact of the necessity thereof in the public interest had been duly found by the City Council, and proceeds upon the assumption that all proper ordinances have been passed and all necessary steps have been taken by the governing body of the City with respect to the construction and financing of the water works.

By the demurrer to the City's answer it is admitted that there "has been no commingling" of the question as to issuing bonds for the water works (involving the exercise of the power to tax) and of the question as to the contract, and that the question of the construction of the water works by the City (involving as a necessary consequence the cost of operating and maintaining same) was determined on its merits as a separate and independent issue. In acting upon the petition of freeholders by resolution or ordinance ordering the election for the water works bonds, in declaring the result of such election, etc., there can be no doubt that the City Council acted, essentially, in its legislative capacity; that is, in determining the question of "public purpose within the power to tax" the City Council was engaged in the exercise of its legislative, as distinguished from either its administrative or judicial, powers. 5 McQuillin on Municipal Corporations (2d Ed.), § 1962.

It is a familiar general rule that the validity of the legislative Acts of a municipal council cannot be impeached in the Court, except upon the ground that such Acts were beyond the powers conferred upon the governing body of the municipality by the Legislature of the State. 19 R. C. L., 904, § 203; *Douglass v. City Council of Greenville*, 92 S. C., 374, 75 S. E., 687, 49 L. R. A. (N. S.), 958. That the legislative power of the City of Rock Hill is vested in the

City Council, and that such legislative power as it may be necessary or proper for the City to exercise in relation to water works is expressly conferred by the Legislature, is not open to question. Act 1914 (28 St. at Large, p. 573) ; Act 1921 (32 St. at Large, p. 751) ; Sections 4696 and 4430, Vol. 3, Code of 1922.

But, even if it were competent or proper for the Court to inquire into the wisdom, expediency, or good faith in the City Council's action in determining in its legislative capacity that the construction of the water works and the issue of bonds contemplated or implied in the contract were in the public interest and for a public purpose within the power to tax, the record furnishes no basis for impeaching Council's action. The good faith of members of the City Council and the facts set forth in their answer, which reasonably warrant the enlargement of the water system in the public interest, are admitted by petitioners' demurrer. The question as to the construction of the water works (entailing as a necessary consequence the expense of operation and maintenance) through an issue of bonds, having been thus determined and settled on its own merits, by the City Council and by the electorate of the City, as a separate and independent issue, there is no basis, from the point of view suggested, for a conclusion that this contract, which presupposes such determination by the City and deals in essential substance with the operation, management, and maintenance of the water works after their construction, should be condemned upon the ground that it involves for its fulfillment the exercise by City of the power of taxation for a private, and not a public, purpose.

In so far as this contention of petitioners is directed to the specific charge that the purpose of the contract is to lease the water works after construction "upon terms which are tantamount to the payment of a subsidy to a private business corporation," thus involving "the use of public funds" raised by taxation for a private purpose, it is ob-

vious that the contention goes to the force and effect of the contract as a business arrangement for the operation, management, and maintenance of the water works after their construction. The contention in that aspect is essentially the same as another contention of petitioners which is thus stated: "It [the contract] contemplates and involves an unreasonable and improvident business arrangement for the City of Rock Hill, whereby public property of said City and valuable rights therein are disposed of and transferred to a private business corporation for a grossly inadequate consideration." The proposition advanced by the foregoing contention—that the contract should be declared invalid upon the ground that it embodies a "bad bargain" for the City, and involves a diversion and waste of public funds for the benefit of private interests—presents, we think, the pivotal question raised by the petition.

Since, as was said by this Court in *Haesloop v. City Council of Charleston, supra*, "it is a general and undisputed proposition of law that a municipal corporation possesses and may freely exercise the powers 'granted in express words' by competent Legislative authority (1 Dillon on Municipal Corporations, § 89; *Luther v. Wheeler*, 73 S. C., 83, 52 S. E., 874 [4 L. R. A. (N. S.), 746, 6 Ann. Cas., 754])," our first concern is to determine the nature and limits of the powers so conferred upon the City of Rock Hill with respect to the ownership, control, and disposition of the additional water system referred to and described in the contract. Section 3015, Vol. 1, Code of 1912, reenacted as of January 12, 1922, as Section 4430, Vol. 3, Code of 1922, was amended by Act approved March 10, 1922 (appendix, 3 Code of 1922, p. 1795), by striking out all of said Section and inserting in lieu thereof the following:

"All cities and towns shall have full power and authority to construct, purchase, operate, and maintain water works and electric light works within or without, or partially within and partially without their corporate limits, for the use

and benefit of such cities and towns and the inhabitants thereof, and to purchase, own and operate and maintain machinery and equipment and apparatus for generating either electricity or gas for the use and benefit of such cities and towns and the inhabitants thereof, and to acquire existing water works by condemnation in the manner now provided by law for railroad corporations to acquire rights of way, or to contract for the erection of plants for water works, sewerage or lighting purposes, one or all for the use of such cities and towns, and the inhabitants thereof, and to sell, convey and dispose of any and all such properties; and to meet the costs of acquiring said properties, or any of them, cities and towns may issue coupon or registered bonds bearing interest at a rate not to exceed six per centum per annum, payable in any legal tender money of the United States of America, and fix the time of payment of such bonds in such matter that the bonds shall mature and be payable in annual or other series or installments, or at such time as the city or town council may fix in said bonds, but not exceeding forty years after date of issue with the privilege of redemption at such time as the city or town council may fix in said bonds: Provided, that before any bonds shall be issued, or any such construction, or purchase, or any such sale, or conveyance and disposal of any such property, or any part thereof, shall be made under the provisions of this section, the city or town council of the municipality shall submit the question of such construction or purchase and the issue of such bonds, or of such sale, conveyance and disposal of such property, to the qualified registered electors of the city or town, at an election to be ordered for that purpose by the city or town council to be conducted in accordance with the laws governing municipal elections: and provided further, that before any election shall be held under the provisions of this section, at least the majority of the resident freeholders of the city or town, as shown by its tax books, shall petition the city or town council that the said election be

ordered; and if a majority of the electors voting in such election shall vote for the issue of such bonds, and the construction, or purchase of such property in question, the city or town council shall so declare by ordinance, and shall acquire the property and issue the bonds and turn them over to the board of commissioners of public works for such city or town, or other officer or body authorized by law to receive such bonds. And if a majority of the electors voting in any such election shall vote for the sale of the property in question, this city or town council shall sell, convey and transfer the same. as so authorized. In all elections held under this section the polls shall be opened at 8 o'clock in the forenoon and shall be closed at 4 o'clock in the afternoon: And provided, further, that proceedings to condemn existing water works shall not be instituted until after an election ordered by the city or town council upon thirty days' notice shall have determined, by a majority of the qualified electors of the city or town the policy of the city or town in favor of municipal ownership of water works. Every sale, conveyance and transfer of any water, gas or electric light works, plant or system, or any part thereof, heretofore made by any city or town is hereby declared to be lawful and valid."

The powers and duties of the board of commissioners of public works, which by the Act of 1914, *supra,* reenacted by Act of February 8, 1929, are devolved upon the City Council of the City of Rock Hill, are thus set forth in Section 4432, Vol. 3, Code of 1922:

"Said board of commissioners of Public Works shall be vested with authority to purchase, build or contract for building said water works and said electric light plant and to operate the same, and shall have full control and management of same. They may supply and furnish water to citizens of said cities and towns and also electric, gas or other light, and may require and exact payment of such rates, tolls and charges as they may establish for the use of water and light.

They may sell and dispose of said bonds and apply the proceeds, or so much thereof as may be necessary, towards the purchase of, or payment for, said plants," etc.

Under the foregoing express and comprehensive grant of power from the Legislature of the State, there can be no doubt that the City of Rock Hill, through its electorate and duly constituted City Council, has plenary discretionary power to make such disposal, including an outright sale, of the water works plant referred to in the contract as it may see fit, subject only to control by the Courts upon and in accordance with the well-settled legal principles which will presently be stated. For the purpose of the application of these legal principles it is to be observed here that under the powers expressly granted to cities and towns by the foregoing statutes, "to construct, purchase, operate, and maintain," and "to sell, convey, and dispose of," water works, it is entirely unnecessary to draw the distinction, which in certain cases may be important, between property held and used by a municipality for governmental purposes and property held and used for general municipal purposes. In so far as such property may be said to be held for governmental purposes or devoted to a special public use (*Black v. City of Columbia*, 19 S. C., 412 [45 Am. Rep., 785]), within the rule requiring express legislative authority to enable a city to sell or dispose of same (*Haesloop v. City Council of Charleston*, 123 S. C., 272, 115 S. E., 596, 600), such legislative authority is "granted in express words" to all cities and towns of the State by the general enabling statute above set out. But that this power of use and disposal of water works property is a discretionary power which a municipality must exercise in conformity with the well-settled general principles of law which govern the exercise of all discretionary powers conferred upon municipal corporations, with respect to the administration, use, and disposal of corporate property, is indisputable. For the purposes of this inquiry, we think, those general principles may be thus stated:

(1) "In the sense that all powers of municipal corporations are held in trust for public use, all property held by such corporations is held in a fiduciary capacity." *Haesloop v. City Council, supra;* 43 C. J., 1340.

(2) The "discretionary power of use and disposal does not include the authority to donate [or devote] municipal property to a strictly private use, for the obvious reason that a transfer or release of such property by a municipality to a private ownership [or use] without receiving in return some consideration of reasonably equivalent value would amount to a palpable breach of the trust upon which it is held." *Haesloop v. City Council, supra;* 43 C. J., 1341.

(3) The measure of a municipal council's fiduciary obligation with respect to the control, management, and disposal of property acquired for or devoted to a special public use is that prescribed in and by the legislative grant of power under which such property is acquired. *Haesloop v. City Council of Charleston, supra.*

(4) In the discharge of such obligation, unless expressly or impliedly restrained by the legislative grant of power, "a municipal corporation has a discretion in the choice of means and methods," and "the usual limitations upon the actions of municipalities within their legal powers are good faith and reasonableness, not wisdom or perfection," tested by "the standard of diligence and prudence that men of ordinary prudence and intelligence in such matters employ in their own like affairs." *State ex rel. Ellis v. Tampa Water Works Co.,* 56 Fla., 858, 47 So., 358, 19 L. R. A. (N. S.), 183; *Haesloop v. City Council of Charleston, supra;* 26 R. C. L., 1306.

(5) "A Court of equity will not attempt to control the discretionary powers conferred on trustees, or, more specifically, will not interfere at the suit of a taxpayer to restrain the authorities of a municipal corporation in the exercise of their discretionary powers with regard to the control or disposition of property of the municipality, in the absence

of illegality, fraud, or clear abuse of their authority. 28 A. & E. Ency. of Law, 991; 28 Cyc., 1744." *Haesloop v. City Council of Charleston, supra.*

In applying the foregoing principles to the action of the electorate and the City Council of Rock Hill in making and undertaking to perform the contract here in question, it is obvious that our next concern is with the measure of the fiduciary obligation prescribed by the legislative grant of power under which the water works property is acquired. That measure is thus clearly and definitely prescribed by the statute (appendix, Vol. 3, Code of 1922, p. 1795) in the language: "All cities and towns shall have full power and authority to construct, purchase, operate, and maintain water works  *  *  * *for the use and benefit of such cities and towns and the inhabitants thereof* *  *  * and to sell, convey and dispose of any and all such properties," etc. (Italics added.) While all property of a municipality, whether devoted to a special use or not, is held for "the use and benefit" of the city or town and its inhabitants, the language of the statute italicized, taken in connection with the unlimited power of sale and disposal expressly given, would seem to lay down a measure of fiduciary obligation quite as broad as that which applies where property is held in a strictly proprietary capacity for general municipal purposes. *See Haesloop v. City Council, supra.*

But, assuming that the special purpose for which such property is acquired limits the "use and benefit" for which it may be held and administered—certainly, so long as the reasonable public necessity which justified its acquirement exists (see 43 C. J., 1340, 1343)— it is clear that the "full power" to "operate and maintain" and the "full control and management" (Section 4432) vested in the municipal authorities confer a discretion as to means and methods of operation and maintenance to the end that the property subserve the purpose of its acquirement which is limited

only by the broad measure of fiduciary obligation prescribed in the statute, "for the use and benefit of such cities and towns and the inhabitants thereof." While in this State it is settled that the operation of water works by a municipality is so far governmental in character as to absolve the corporation from liability sounding in tort (*Black v. City of Columbia,* 19 S. C., 412, 45 Am. Rep., 785), there can be no doubt that in the fiscal aspect thereof the operation and maintenance of such utility partake largely of the nature of a commercial or business enterprise. Indeed, by the great weight of authority in other jurisdictions the commercial nature of the enterprise is so far held to be controlling as to require the conclusion that the operation of a water works system is a function undertaken by a municipality in its private or proprietary capacity. 19 R. C. L., 764, § 69; 5 McQuillin on Municipal Corporations (2d Ed.), § 1962.

Certainly, the operation, maintenance, and disposal of such a water works system "for the use and benefit" of a city and its inhabitants calls for the exercise of the same kind of "common sense," business judgment, and discretion as to means, methods, and policies on the part of the municipal authorities as would be exercised and applied in the conduct of a similar enterprise by a private individual or corporation. The mechanical and physical purpose of a water works system is to supply a city or town and its inhabitants with water. The civic or municipal purpose in acquiring and maintaining such property is as comprehensive as the public interests which the supply of water so made available tends to promote. That view has been clearly enunciated by this Court in the case of *Ancrum v. Camden Water, L. & I. Co.,* 82 S. C., 284, 64 S. E., 151, 21 L. R. A. (N. S.), 1029, where Mr. Justice Woods, as the organ of the Court, in speaking to the point of such municipal purpose in the aspect of fire protection, said:

"The general municipal purpose of a water supply is to promote the prosperity of a city. This it does by lessening

the risk of destruction of property by fire, by lowering the rate of insurance, increasing the general sense of security, and therefore the general happiness, diminishing the risk of numbers of persons being thrown out of employment, and generally in giving steadiness and confidence to the life and enterprises of a city."

But, however important a water supply may be for purposes of fire protection, that the prosperity of a city, which it is the general purpose of a water supply to promote, is even more directly promoted by making such water supply available for, and by using it upon fair terms to supply, the needs of industries upon which the prosperity of so many modern urban communities vitally depends, would seem to be self-evident.

In the light of the foregoing interpretation of the measure of the fiduciary obligation imposed upon the municipal authorities of Rock Hill, under the well-settled principles of law above stated, it is clear, we think, that this contract may not be pronounced invalid upon the ground that it contemplates and involves such a donation or diversion of public property to a private use as amounts to a breach of the trust imposed upon the City Council to operate, manage, and dispose of the water works, about to be constructed, "for the use and benefit" of the city and its inhabitants.

In the answer of the City it is alleged "that the City by this contract secures the operation, maintenance, and replacement of said additional water supply system at a low cost and under conditions which provide for its continuous operation and availability for the City's use in case of emergency, so that the benefits of such arrangements will inure to all the citizens"; "that the business arrangement as set forth in the contract with the company is a reasonable one, and will be highly advantageous to the city and all its taxpayers and residents; that the consideration to be derived from said arrangement by the city of Rock Hill is not only entirely adequate, but highly compensatory; that the use by the city

of its taxing power, in order to carry out its contract, is in accordance with the wish of its citizens expressed in a unanimous vote at the polls, and is not for a private use, but for the essentially and vitally public purpose of securing for its citizens an adequate supply of water at a lower cost than would be otherwise obtained."

In the separate answer of the Rock Hill Printing & Finishing Company, it is alleged that the findings of fact made by the City Council of Rock Hill, as evidenced by certain resolutions adopted by the Council and referred to and set out in the contract, to the effect "that the construcion of such additional water supply system and the operation and maintenance of same in accord with the terms and conditions of the said contract will provide the City and its inhabitants with a supply of water reasonably commensurate with the investment involved at a cost for operation and maintenance which is financially advantageous to the city," are true and correct, and that "for all rights and privileges granted to it under the said contract the city receives a fair and adequate consideration, and this respondent pays a fair and reasonable compensation."

By the petitioner's demurrer to the answers of respondents, the foregoing allegations are admitted, except in so far as they embody legal conclusions which it is the duty of the Court to draw from a construction of the contract. From an examination of the terms and provisions of the contract for purposes of construction, it cannot be concluded as a matter of law, either that the contract is an unreasonable business arrangement for the City from the standpoint of dollars and cents, or that the force and effect thereof are to divert public property to a private use and to transfer valuable rights therein to a private business corporation for a grossly inadequate consideration.

Broadly stated, the consideration received by the City is a fixed supply of water delivered to it for the use and benefit of the City's present water supply system and relief from

the burden of physical operation and maintenance of the plant and equipment, and the consideration received by the Company is the right to use the surplus or excess water derivable from its operation of the water works plant and equipment and to empty its sewage into the City's sewers, and certain payments in money to be made by the municipality. Whether the supply of water received by the City is "adequate and reasonably commensurate with the investment involved," and whether the cost thereof to the municipality under the terms of the contract is "lower than would otherwise be obtained" are questions of fact which involve for their determination the exercise of the business judgment of the municipal authorities in the light of knowledge of the cost of material, machinery, labor, power, and other pertinent engineering data, which it is peculiarly within the province of the municipal authorities to obtain and apply. It is admitted that painstaking investigation of the facts has been made by the municipal authorities, and that in the working out of details the City was represented by the Councilmen of the City Council, "who are able and experienced business men, familiar with local conditions, assisted by experienced and skillful bankers, engineers, and legal counsel."

In the case of *Columbia Water Power Co. v. Columbia,* 5 S. C., 225, involving the specific performance of a contract which provided for the building by the plaintiff of a water works system for defendant City, the operation of same at plaintiff's expense for twenty years, and payment by defendant of the sum of $16,000 annually, the point was made by the defendant City on appeal that "it clearly appeared by the evidence that the City of Columbia had heretofore been amply supplied with water, at the cost of between $6,000 and $7,000 per annum," and that "it appeared by the contract that the City of Columbia was, for a term of 20 years, to pay to the other contracting party the large sum of $16,000 per annum," etc. In disposing of that contention this Court said:

"The propositions advanced by the twelfth exception are entirely inadmissible. This Court has nothing to do with the question of the fairness of the price agreed to be paid by the defendants, under the issues raised in this case. The right and authority to determine that matter rested with the city council. They have fixed the terms of contract, and, unless upon proper issues, it is found to be void, inoperative, or terminated by competent authority, it must be enforced by the Courts without regard to any opinion which they may form as to the fitness of its provisions."

In the case of *Stone v. City Council of Greenville,* 113 S. C., 412, 102 S. E., 756, involving an alleged improper expenditure for additional fire apparatus by the City, this Court said:

"It is the business of council and not of the citizens, to determine what is best to be done with regard to the city's affairs. The discretion is vested in the council by law, and they are not to be controlled in its exercise by the citizens, and not even by the Courts, provided they act within the law, and it will always be assumed that they will so act, until the contrary is made to appear."

In so far as it is inferable from the contract and the facts admitted that the Rock Hill Printing & Finishing Company, the other contracting party, receives a peculiar or special benefit from the carrying out of the terms and provisions of the contract, it does not appear that such peculiar benefit is unfair or discriminatory, in a sense that involves the appropriation or diversion of public property to a private use. Aside from the consideration that every contracting party may be said to derive some peculiar or special benefit from the performance of a contract entered into for commercial or business reasons, it is a matter of common knowledge that most public improvements, such as the opening and building of streets, the construction of public buildings, the installation of sewerage, etc., result in and inure to the special and peculiar benefit of certain residents

and citizens of a municipality, who may own property located in close proximity thereto. The validity of a municipality's action in this aspect may be impeached only upon the ground of fraud or bad faith. 43 C. J., 304, § 317; see *Douglass v. City Council of Greenville,* 92 S. C., 379, 75 S. E., 687, 49 L. R. A. (N. S.), 958. The contract embodies the City's choice of means and methods of operating and maintaining the waterworks within the discretion conferred by the statute, and it cannot be held as a matter of law from a construction of the contract that in the exercise of that discretion the City Council and electorate have transcended the limits of reasonableness and good faith.

It follows that the contentions of the petitioners hereinabove discussed and considered cannot be sustained. The views announced, we think, render an extended discussion of the remaining specific questions raised by petitioners as to the validity of the contract, unnecessary. These, however, will be stated and briefly discussed.

The contentions that the contract "involves the leasing of a part of said City's water works system without the express authority of the Legislature of the state," and that "the city council of the said city has no jurisdiction and authority to contract for the period of time covered by said agreement," may properly be considered together. To the extent that the contract involves a lease of the water works plant and equipment, if express legislative authority be necessary in this case, it is conferred by the terms of the enabling statute hereinabove set out, granting the power "to sell, convey and dispose of." That "a grant of power to sell necessarily carries with it a grant of power to transfer an interest less than an absolute one" would seem to be self-evident. 43 C. J., 1342, *Waskey v. Chambers,* 224 U. S., 564, 32 S. Ct., 597, 56 L. Ed., 885, Ann. Cas., 1913-D, 998. "In the absence of legal inhibition, a lease may be made for any length of time the parties elect." Syllabus, *Columbia Ry. Gas & E. Co. v. Jones, et al.,* 119 S. C., 480, 112 S. E., 267.

But, if the contract is essentially an "operative" agreement, as above pointed out, there would seem to be no necessity, upon either principle and authority, for express legislative sanction. 5 McQuillin on Municipal Corporations, § 1947; *City of Los Angeles v. Los Angeles City Water Co.,* 177 U. S., 558, 20 S. Ct., 736, 44 L. Ed., 886; *Baily v. Philadelphia,* 184 Pa., 594, 39 A., 494, 39 L. R. A., 837, 63 Am. St. Rep., 812. In the aspect of the reasonableness of the term, certainly if the contract is financially advantageous to the City, a provision operating to secure such advantage permanently or for a long period of time is not open to criticism, and the presumption must be indulged that the City contracted "for the city's own benefit as a municipality." *Ancrum v. Camden W. L. & I. Co., supra.* The grounds of attack above noted are therefore clearly untenable.

Another contention of petitioners is that the "contract contemplates and involves an unlawful delegation to a private corporation of the fiduciary and discretionary powers of the City Council in the control and management of a governmental department of said city." The authority delegated to the Company under the contract is the authority to control, manage, and operate the water works plant and equipment for the merely physical or mechancial purpose of delivering to the City a fixed quantity of water. It is, in essence, the same kind or character of authority as is conferred on any servant or agent employed by a municipality to maintain and operate any part of a city's physical plant or mechanical equipment. No authority whatever is conferred on the company to distribute, or control in any manner whatever, the supply of water delivered to the City from the Company's mechanical control and operation of the physical plant and equipment; on the contrary, such authority is expressly withheld. It would therefore seem to be sufficiently apparent, without discussion, that there is no unlawful delegation of the fiduciary and discretionary powers of the municipality with respect to control and management of the governmental department of the City.

Another similar contention of petitioners is that the contract "contemplates and involves the unlawful delegation to certain trustees named of the right, on the order of a certain private corporation named, to operate [expend?] and disburse public funds belonging to the city of Rock Hill." The provision of the contract, in substance, is that the money necessary to construct and complete the additional water supply system shall be deposited with two Rock Hill banks, as cotrustees, to be dedicated solely to the purposes of the agreement, and to be paid out by such trustees, from time to time, to the persons entitled thereto for the actual cost of construction, upon certificates of engineers, whose services for such purpose are retained and paid for by the City.

From the point of view of the City's fiduciary duty to expend the funds acquired for the specific purpose of constructing the water works, there is no valid objection to the City's agreement to set aside these funds in the hands of depositaries, called trustees, to the end that such purpose be safeguarded. No discretionary power is conferred upon the so-called trustees. The function of the banks, as well as the function of the City's engineers, is clearly ministerial or administrative, within the rule permitting a municipal body to delegate the discharge of such functions to agents or subordinate officials. 43 C. J., 242, § 240. The delegation of authority in a matter involving technical knowledge and expert skill is clearly within the power of the City Council. 19 R. C. L., 1076, § 361; 43 C. J., 245, § 244; *Chase v. Los Angeles,* 122 Cal., 540, 55 P., 414; *Minneapolis v. Republic Creosoting Co.,* 161 Minn., 178, 201 N. W., 414; *Guyer v. Rock Island,* 215 Ill., 144, 74 N. E., 105; *Hildreth v. Longmont,* 47 Colo., 79, 105 P., 107; *Johns Hopkins Club Building Co. v. Page,* 130 Md., 282, 100 A., 298.

The only remaining contention is that "it is beyond the power of the city council on behalf of said city to assume liability for the disposal of the sewage,

waste products, and effluent of the respondent the Rock Hill Printing and Finishing Company, and to undertake to save said private corporation harmless with respect to injury and damage resulting from the disposal of such sewage, waste products, and effluent, and from its operation and management of said leased property." Under the general statute (Section 4446, Vol. 3, Code 1922) every municipal corporation in this State has plenary authority to establish and extend a system of sewerage, and its rights in that regard are protected and safeguarded by the grant from the State of the power of eminent domain. It appears from the contract, and is admitted as a matter of fact by the pleadings, that the agreement on the part of the City to afford the Company an outlet and means of disposal of the surplus or excess water derived from the operation of the water works plant for the use in its manufacturing business is an "especial consideration" for the undertaking on the part of the Company to operate and maintain the water works on terms financially advantageous to the City.

It is further admitted that the municipality, "through its established system of drainage and sewerage," has "available" and is "in position" to provide the Company with ways and means for the necessary "taking off and disposal" of the used water, waste, and effluent of its manufacturing plant, and that, in the opinion of the City's engineers, such disposal of the waste water in question will "to a large extent decrease the relative pollution" of the branch through which the City's sewage now passes. That the waste water of the Company thus used in manufacturing processes, as well as its ordinary sewage matter, may properly be received into the City's sewerage system and disposed of through it, is not disputed. As a general rule a municipality may not contract with one member of the public to discharge a purely public duty owed to the public generally. 44 C. J., 73, § 2128, *Black v. City of Columbia*, 19 S. C., 412, 45 Am. Rep., 785. The rationale of that rule is grounded upon the theory that such

a contract would "restrict the discretion of the municipality, beyond the scope of its charter" (*Black v. City of Columbia, supra*) ; that is, embarrass or control it in the exercise of governmental functions, which cannot be surrendered or abrogated.

The soundness of that rule properly applied, is not questioned; but, in the state of facts here presented, we do not think it may be invoked to invalidate the provision of the contract now before us. In so far as the obligation of the City here assumed, to provide the Company with an outlet through its sewerage system, is assumed by the City Council in the discharge of a public duty owed to the public of the municipality generally, it is assumed primarily and esentially in the discharge of the fiduciary duty to manage the property and instrumentalities of the City for its use and benefit and to administer its fiscal affairs in the interest of public economy and of municipal prosperity. In the discharge of that duty the City of Rock Hill, within the limits of reasonableness and good faith, as we have seen, is expressly authorized and empowered to contract with respect to the subject-matter of this contract.

The right to the use of the City's sewerage system, granted the Company by the contract, is not granted in the discharge of the purely public or governmental duty to provide it and the public generally with sewerage in the interest of the public health or general welfare, but primarily and essentially for the purpose and to the end that the City may by contract secure the operation and maintenance of an additional water works system upon advantageous terms. If to that end the sewerage system of the City, which as a matter of common knowledge cannot be operated, except in conjunction with a water works system, may be utilized by the municipal authorities, not only without interfering with the public and governmental object for which it was acquired, but for a purpose consonant therewith, and which, it is claimed, will enhance the carrying out of that object, there would seem

to be no valid objection to the assumption of a contractual obligation in that regard.

Petitioners have cited no decision, and we have found none, holding that a contract made by a city to extend its water mains and sewers, and to give access thereto, in consideration of service performed or property conveyed to the City by the contractee, is invalid because *ultra vires,* or in derogation of the City's police power. In the case of *Lambeth v. City of Thomasville,* 179 N. C., 452, 102 S. E., 775, 776, the City made a contract with a property owner whereby it agreed, in consideration of the conveyance to the City by the property owner of certain real estate for street and school purposes, to extend the water main and sewer line of the City along certain street, "so that the purchasers of the lots [thereon] might have access to those necessities." The Court enforced the contract, holding with respect to the City's authority to make the contract as follows:

"The term *'ultra vires'* is used to designate the acts of corporations beyond the scope of their powers as defined by their charters or acts of corporation. Such lack of power upon the part of the defendant is not pleaded, and the charter of the defendant is not in the record. We therefore assume that the defendant is vested with the usual authority given to cities and towns to lay out streets and to construct sewers and water mains and other municipal conveniences and necessities within the corporate limits of the city. Assuming that the defendant city has the usual corporate authority generally accorded to municipalities, we conclude that the defendant had power to enter into the contract sued on."

See, generally, *Florida East Coast Ry. Co. v. City of Miami,* 76 Fla., 277, 79 So., 682, 1 A. L. R., 303; *Henrietta Country Club v. Jacobs* (Tex. Civ. App.), 269 S. W., 137; *Wichita Water Co. v. Wichita* (D. C.), 234 F., 415; *Omaha Water Co. v. Omaha* (C. C. A.), 147 F., 1, 12 L. R. A. (N. S.), 736, 8 Ann. Cas., 614; *Colorado Springs v. Colorado City,* 42 Colo., 75, 94 P., 316; *Sibley v. Ochyedan*

*Electric Co.,* 194 Iowa, 950, 187 N. W., 560; *Belcher Sugar Refining Co. v. St. Louis Grain Elevator Co.,* 101 Mo., 192, 13 S. W., 822, 8 L. R. A., 801; *Haesloop v. City Council of Charleston, supra.*

If, in the state of facts presented by the record, the City has the authority to make a valid contract to grant the Company the right to use the sewerage system, as we think it has, it follows that it is not beyond the power of the City to assume liability for the disposal of the sewage, etc., "after same shall have passed into said sewer," and to agree to save the company harmless against claims and suits arising out of said sewage and disposal thereof. In the circumstances contemplated, the liability, if any, as between the City and the Company, would clearly be the legal liability of the City and not of the Company. That is likewise true as to the other circumstances and conditions under which the City, by the terms of the contract, agrees to protect the Company against claims and suits for damages, etc. The City assumes no liability for the company's negligence. The liability assumed being legally and justly the City's own liability, the rule that "it is not permissable for a municipal corporation to enter into contracts of guaranty or suretyship" (44 C. J., 75) has no application.

As was said by this Court (McIver, J.) in *Coleman v. Chester,* 14 S. C., 286, 291, 292: "But a municipal corporation may make contracts, and it is bound by them, and if its officers or agents, acting under its directions, commit a trespass, of the benefits of which the corporation continues to avail itself, it may bind itself by contract to pay the damages resulting from such trespass."

If a municipal corporation may bind itself by contract to pay "the damages resulting from" trespass, no reason is apparent why it may not contract to pay the damages, if any, resulting from the disposal of its sewage or from other municipal activities conducted by it, or for it under its authority. That the liability thus assumed, where the City is vested with the power of eminent domain, as here,

entails no unreasonable risk (*Matheny v. Aiken*, 68 S. C., 163, 47 S. E., 56), is clear. The petitioners' contention in this aspect of the case must therefore be overruled.

*As to Bonds:* Petitioners' first contention is "that the purpose of the bond issue as stated in the petition of freeholders asking for said election is 'enlargement and extending the water works system of the City of Rock Hill,' whereas the purpose of the bond issue as set forth in the resolution of the City Council ordering said election and in notice of election as published is 'paying for improvements on the water works system.' " There is no real difference in meaning between the language used in the petition of freeholders and that employed in the resolution of Council and in the notice of election, and we think the objection is patently hypercritical. It is admitted that the ballots used at the election set forth the language of the resolution and notice, "improvements," etc., with a parenthetical interpretation thereof in the language of the petition, "enlarging and extending," etc.; so that in no view could the electors have been misled. See *Connolly v. Beason,* 100 S. C., 74, 84 S. E., 297; *Summerville v. Bank,* 115 S. C., 183, 105 S. E., 32; *Sullivan v. City Council of Charleston,* 123 S. C., 91, 116 S. E., 104; *Lucas v. Barringer,* 120 S. C., 68, 112 S. E., 749. This contention must therefore be overruled.

The remaining propositions advanced by petitioners are all directed to the contention that the bonds should be declared invalid for the reason that the proceeds are to be applied to the carrying out of the contract hereinabove discussed and considered. The same objections to the validity of the contract which are here made have been hereinabove passed upon and found untenable. It follows that the bonds cannot be held invalid on that ground. Aside from that, however, the bonds having been duly authorized by separate proceedings and at a separate election for an entirely valid purpose, the invalidity of the contract would not affect the validity of the bonds.

If, however, the foregoing conclusions were open to doubt, all questions as to the validity of the bonds are resolved in favor of such validity by an Act of the General Assembly, ratified February 8, 1929, during the pendency of this proceeding, whereby the proposed issue of bonds is validated, confirmed and declared legal in all respects. *Lucas v. Barringer, supra.*

Since, under the foregoing views, neither the contract nor the bonds can be declared invalid, the conclusions follow: (1) That the contract is valid and binding in all its provisions upon the contracting parties; and (2) that the bonds proposed to be issued will constitute valid and binding obligations of the City of Rock Hill.

The judgment, therefore, of this Court, is that the injunction prayed for be denied, and that the petition be dismissed.

MR. CHIEF JUSTICE WATTS and MESSRS. JUSTICES COTHRAN, BLEASE and CARTER concur.