222 S.C. 534 (1952)
73 S.E.2d 699
BABB
v.
GREEN, MAYOR, ET AL.
16696
Supreme Court of South Carolina.
December 19, 1952.
*535 Messrs. Leatherwood, Walker, Todd & Mann, of Greenville, for Appellant.
*536 Mr. Jas. M. Richardson, of Greenville, for Respondents.
The following is the opinion of Judge Martin in the court below.
This case was heard by me at Chambers on the pleadings, and on the facts as presented from them, supplemented by certain other facts stipulated by the parties. The statement as to the facts as incorporated in this Decree, are fully agreed to by the parties.
The suit seeks a declaratory judgment to determine whether the Town Council of the Town of Fountain Inn may convey to Mauldin-Simpsonville-Fountain Inn Water District the Municipal Water System of the Town of Fountain Inn for a price which is less than the intrinsic value of the System. The facts, upon which the controversy depends, are as follows:
The Town of Fountain Inn owns a Municipal Water System, and has been operating it for the benefit of its residents for many years. The System was first established in 1917 in accordance with the applicable Constitutional and Statutory provisions. The original cost of the acquisition of the Waterworks System was paid for through an issue of general obligation bonds. While these bonds have been refunded, the Town's records indicate that the sinking fund *537 on hand to retire the Refunding Bonds is equal to the remaining outstanding $12,000.00 of bonds, which mature $4,000.00 on April 1st, in each of the years 1953 to 1955, inclusive.
As of October 1st, 1951, the Town issued $250,000.00 general obligation Water and Sewer Bonds, to which issue of bonds further reference, in some detail, is hereafter made. While the greater portion of the proceeds of this issue was expended for Sewer improvements, nevertheless extensions to Water lines, at a cost of approximately $47,000.00 were installed from their proceeds.
The water supply of the Town is obtained from deep wells, from which water is pumped to storage or pressure tanks. During the last several years, there has been a noticeable drop in the water table of the subterranean water supply relied upon for water, with the immediate consequence that it has become extremely expensive to pump sufficient water to properly supply the residents of the Town. The System does not produce any real profit and there is real danger that the water supply may deteriorate still further. A similar situation as to water supply exists in Simpsonville, where the water supply has given indications of failing altogether.
In 1951, the General Assembly, evidently mindful of the situation to which I have referred, created the Mauldin-Simpsonville-Fountain Inn Water District. See Act 559, 47th Statutes at Large, page 1185. The territorial limits of this District include the unicorporated Town of Mauldin, and the incorporated Towns of Simpsonville and Fountain Inn. The District was empowered to construct, establish, maintain and operate a water system to "furnish an adequate supply of water, for all purposes, for the district and the residents thereof". In order to accomplish this purpose, the Board of Commissioners of the District was empowered to issue bonds, should the election required by the Act be held and result favorably. The election was held, did result *538 favorably, and the District proposes to issue bonds, construct and operate a Water System throughout its territorial limits, including that portion of the District lying within the corporate limits of the Town of Fountain Inn and the Town of Simpsonville. Under the proposed plan, the District will enter into a long-term contract with the Commissioners of Public Works of the City of Greenville to buy water from that agency. This water, in turn, will be distributed throughout the District.
In order to render uniform service to all within the District, whether living within or without the limits of any incorporated town therein, the District proposes to acquire the municipal systems of Fountain Inn and Simpsonville. Negotiations looking to this result were entered into between the respective Town Councils of Fountain Inn and Simpsonville and the District, and an agreement was reached by which each incorporated town would convey its Water System, including all sources of water supply and distribution facilities, to the District for the sum of $15,000.00. This sum is considerably less than the intrinsic value of the Fountain Inn System, as now installed, which has been conservatively estimated to be at least $75,000.00. The District would, in turn, propose to guarantee to the inhabitants of each Town an ample supply of water.
The agreement also provides that should the District cease to function and its functions are not taken over by some other public body succeeding to its rights, that in such event each Town should have the right to acquire so much of the District's System as shall lie within its then corporate limits at the fair appraised value of that portion of the System.
In accordance with the provisions of Section 7277, each Town Council adopted a resolution ordering the election required by that statute to determine whether such Town Council should be empowered to sell and dispose of its Water System on such terms. Both elections were held on *539 Tuesday, September 2nd. The election in Fountain Inn resulted favorably to the proposal by a vote of 252 to 14, while that in Simpsonville likewise resulted favorably by a vote of 213 to 0. (I make mention of the situation in Simpsonville for the reason that while no litigation testing the right of that Town Council to consummate its contract has been instituted, it is recognized by counsel that a similar situation will prevail and that the result here will determine the course of procedure to be followed in Simpsonville.)
The facts thus far outlined present the first question raised by this litigation, viz., has the Town Council of the Town of Fountain Inn the right to sell the municipal water system of the Town of Fountain Inn to the Mauldin-Simpsonville-Fountain Inn Water District for a cash consideration of less than the intrinsic value of the system?
The second question raised by this case does not exist in Simpsonville. It has already been noted that the Town of Fountain Inn issued, as of October 1st, 1951, $250,000.00 Water and Sewer Bonds. These bonds mature as follows:
$5,000.00 on October 1st, 1955;
$7,000.00 on October 1st, in each of the years 1956 to 1960, inclusive;
$8,000.00 on October 1st, in each of the years 1961 to 1965, inclusive;
$10,000.00 on October 1st, in each of the years 1966 to 1971, inclusive;
$15,000.00 on October 1st, in each of the years 1972 and 1973; and
$20,000.00 on October 1st, in each of the years 1974 to 1977, inclusive;
(callable on October 1st, 1961, or any subsequent interest payment date, on the terms and conditions provided in the bonds and in the proceedings, authorizing their issuance.)
The bonds were authorized as the result of a special election held in the Town of Fountain Inn on the 24th day of April, 1951, which election was ordered after the receipt *540 by Town Council of a petition signed by a majority of the freeholders seeking the election.
On July 31st, 1951, there became effective Act No. 409 of the Acts and Joint Resolutions of the General Assembly for that year, known as the Municipal Bond Act, which prescribes the procedure by which incorporated cities and towns might issue general obligation bonds. Section 16 of that Act provides:
"Such bonds shall be sold at public sale, after advertisement of the same in a newspaper having general circulation in the state of South Carolina, or in a financial publication published in the city of New York, or, in the discretion of the municipal council, in both publications. Such advertisement shall appear not less than ten days prior to the occasion set for such sale. The bonds may be disposed of at private sale if there are no bids received, or if all bids are rejected. The provisions of this section shall not prevent a sale at private sale to the United States of America, or any agency thereof."
In accordance with this provision, Town Council caused an advertisement of the sale of these bonds to be published in the Columbia State on the 10th day of September, 1951, nothing that it would receive bids for the sale of these bonds until 11 A.M. (EST), Thursday, September 27th, 1951. In accordance with the custom of indicating in such notices the nature of the security offered, the advertisement stated that the bonds would be payable, both as to principal and interest, "from an ad valorem tax, without limit as to rate or amount, on all taxable property in said Town".
It appears from the transcript of proceedings relative to the issuance of these bonds, afterwards filed in the offices of the Clerks of Court for Greenville and Laurens Counties, and exhibited to me, that no bids for the sale of the bonds were received. Afterwards, and acting in accordance with the provisions of Section 16, authorizing the disposition of the bonds at private sale if no bids were received at the *541 public sale, the Town entered into negotiations with L.H. Ghormley & Company, and associates, of Knoxville, Tennessee, looking to the sale of these bonds. Apparently, this concern offered to purchase the bonds at 3 1/4% interest if the Town would, in pursuance of the right granted to it under Section 20 of the Act, additionally secure the bonds by a pledge of the net revenues derived from the operation of the Waterworks System. When this proposal was submitted to bond counsel advising the Town, they notified the Town Council and the proposed purchasers that such a sale would not, in their opinion, be authorized by the Act, for the reason that general obligation bonds, additionally secured by a pledge of the net revenues, had never been offered publicly, and, hence, the Town would not be in a position to take advantage of the private sale provision of Section 16.
On receipt of such advices, the proposed purchaser agreed to buy the bonds as general obligation bonds, and without the additional pledge of net revenues. The transaction was then consummated, and the proceedings show that the Town Council accepted an offer of the purchasers, to purchase bonds of a tenor corresponding to those advertised, at a price of par and accrued interest to date of delivery, for bonds bearing interest at the rate of 3 1/4% per annum. The written proposal of the purchaser provides that if the Waterworks System be sold, its proceeds should be applied to the retirement of the bonds of this issue. The applicable statute requires such a procedure in any event.
Subsequent to the occasion when the bonds were executed, delivered and paid for, new negotiations took place between the Town and the purchasers, and the purchasers once more sought to have the Town agree that the bonds, which had been issued as general obligation bonds only, should be additionally secured by a pledge of the revenues of the Waterworks System. Perhaps motivated by a fear that further indebtedness on the Water System would create too great a burden on the taxpayers and water consumers of the Town, the Town did on the 26th day of November, 1951, *542 adopt a resolution, which after reciting the facts of the matter, provided:
"That, as additional security to the holders of the bonds above described, there be pledged, in addition to the full faith, credit and taxing power of said Town, the net revenues which the Town of Fountain Inn may hereafter derive from the operation of its Waterworks System, said pledge to inure to the present and future holders of said bonds, without priority or preference."
The plaintiff in this case is a taxpayer of the Town and also owns Bonds Nos. six and seven of the issue, and, hence, is in a position to raise the second question which this court is called upon to pass on, viz., is the pledge of the revenues of the Water System of the Town of Fountain Inn, for the purpose of additionally securing its general obligation bonds of October 1st, 1951, made subsequent to the execution and delivery of such bonds, effective and enforcible? On the answer to this question hinges not only the right of the Town to go forward with its contract with the District, but there also enters the question as to whether the District will be able to avail itself of the net revenues from this part of the System, to additionally secure the bonds which it proposes to issue for the construction and acquisition of its System.
I shall discuss these questions in the order listed.

Question 1
Has the Town Council of the town of Fountain Inn the right to sell the Municipal Water System of the Town of Fountain Inn to the Mauldin-Simpsonville-Fountain Inn Water District for a cash consideration of less than the intrinsic value of the system?
It is conceded, as indeed it must be, that the statute law of the State specifically empowers cities and towns which own water systems to dispose of them, if the election required by Section 7277, Volume 4, Code of Laws of South *543 Carolina, 1942, has resulted favorably. For this reason, we do not have in this case a situation similar to that which existed in the case of Carter v. City of Greenville, 175 S.C. 130, 178 S.E. 508, wherein it was argued that the general power of sale given to incorporated towns of population of 1,000 inhabitants or more by Section 7431, to sell real and personal property, had no application to property held for governmental purposes. The situation is more nearly analogous to that presented to the court in the case of Haesloop v. City Council of Charleston, 123 S.C. 272, 115 S.E. 596, wherein it was unsuccessfully argued that the City of Charleston might not convey for no cash consideration a certain lot of land to one proposing to construct the hotel now known as the Fort Sumter Hotel. In fact, the only distinction between the Haesloop case and the instant case appears to lie in the fact that in the Haesloop case the property was not devoted to governmental purposes. But, even that distinction may not exist in view of certain holdings of our court which refused to recognize the distinction noted in some jurisdictions between the private and governmental functions of municipal corporations. Irvine v. Town of Greenwood, 89 S.C. 511, 72 S.E. 228, 36 L.R.A., N.S., 363; Farrow v. City Council of Charleston, 169 S.C. 373, 168 S.E. 852, 87 A.L.R. 981; and Carter v. City of Greenville, supra.
What we actually have is a situation in which it is sought to enjoin a fiduciary from disposing of property as to which a power of sale exists, for all property held by municipal corporations are held in trust for the public use. Haesloop v. City Council of Charleston, supra.
Now, it is a well-settled principle that a court of equity will not attempt to control the discretionary powers conferred upon trustees, or more specifically will not interfere at the suit of a taxpayer to restrain the authorities of a municipal corporation from the exercise of their discretionary power with regard to the control or disposition of property of the municipality, in the absence of *544 illegality, fraud or clear abuse of authority. Haesloop v. City Council of Charleston, supra.
While a sale of property for a sum of money, admittedly less than the true value of the property sold, might, under certain circumstances, imply an abuse of the discretion vested in the municipal authorities, there are many instances, including the present one, where such is not the case. The general purpose of a water system is to promote the prosperity of the incorporated town. The functions of a water system are three-fold. It lessens the risk of destruction of property by fire. Ancrum v. Camden Water, Light & Ice Co., 82 S.C. 284, 64 S.E. 151, 21 L.R.A., N.S., 1029. It supplies the inhabitants of the town with water for domestic use, and perhaps, even more important, a water supply may promote the welfare of a municipality by making water available upon fair terms to the needs of industry upon which the prosperity of so many modern urban communities so vitally depends. Green v. City of Rock Hill, 149 S.C. 234, 147 S.E. 346.
Now, in the instant case, it appears that a shortage exists in the water supply and surely the distribution system is of little value without an adequate source of water. It was because of this situation that the General Assembly, the municipal authorities and the voters of the Town have acted, evidently believing that the only sure available source of water obtainable is that from the municipal water system of the City of Greenville, which appears to be blessed with an adequate supply of water. For this reason, I am satisfied that the step taken by the municipal authorities is to the real advantage of the citizens, and the undertaking to sell the system on the terms already mentioned should not be enjoined. Here not only is there no evidence of fraud or clear abuse of municipal authority, but, on the contrary, here is evidence of discretionary power well used. Other illustrations of instances in which our court refused to enjoin the exercise of the discretionary powers of the governing bodies of municipal corporations are noted in Green *545 v. City of Rock Hill, supra, and O'Dowd v. Waters, 130 S.C. 232, 125 S.E. 644.

Question 2
Is the pledge of the revenues of the water system of the Town of Fountain Inn, for the purpose of additionally securing its General Obligation Bonds of October 1st, 1951, made subsequent to the execution and delivery of such bonds, effective and enforceable?
The disposition of the second question for decision is not quite as simple. The plaintiff is the owner of two bonds issued by the Town of Fountain Inn under date of October 1st, 1951. According to the proceedings authorizing the issuance of these bonds, and according to the language of the bonds themselves, the payment of the principal and interest of these bonds is secured by a pledge of the faith and credit of the Town, which obligates the Town to levy upon all taxable property within the Town ad valorem taxes without limit to pay the principal and interest of such bonds, as the same mature. However, subsequent to the issuance of these bonds, the municipal council undertook to further secure its obligation to pay the principal and interest of the bonds by pledging.
"(In addition to the full faith, credit and taxing power of said Town), the net revenues which the Town of Fountain Inn may hereafter derive from the operation of its Waterworks System, said pledge to inure to the present and future holders of said bonds, without priority or preference."
The question to be decided, therefore, is whether this pledge constitutes a part of the contract between the bondholders and the Town. A subordinate question might arise from the wording of the pledge, as to whether the pledge specifically prohibits the Town from disposing of its water system, in view of the wording of the pledge underscored, supra. If the pledge does constitute a part of the contract, then it is enforceable, and a violation of the pledge should and must be enjoined by the court to uphold the obligation *546 of the contract. Martin v. Saye, 147 S.C. 433, 145 S.E. 186.
Now, it would seem clear that both under the new Municipal Bond Act, Section 20, and under the law as it existed prior to the enactment of this statute, that municipal corporations might additionally secure general obligation bonds by a pledge of the revenues derived from its Water System. Such, in fact, was specifically authorized and upheld by this court in the case of Simons v. City Council of Charleston, 181 S.C. 353, 187 S.E. 545. Hence, the statutory provisions in the Municipal Bond Act merely implement and define the method of the exercise of a power already recognized as belonging to municipal corporations. Consequently, if this pledge has been properly made, prior to the delivery of the bonds, there would be no question as to its enforceability. But, here such was not the case.
Prior to the enactment of the Municipal Bond Act of 1951, no statute existed prescribing the disposition of general obligation bonds at public sale, and, in view of the absence of such a statutory requirement, our court properly held in the case of Williams v. City of Rock Hill, 177 S.C. 82, 180 S.E. 799, 100 A.L.R. 604, that a city might dispose of general obligation bonds at private sale. However, the law on this subject has been changed. Obviously mindful of the fact that a sale of municipal bonds by one city often has a direct influence upon the price which similar bonds of other municipalities of the State would bring, and evidently believing that as a general rule a public sale of such bonds produced the most advantageous results, the General Assembly, in its new Municipal Bond Act, provided that general obligation bonds be sold at public sale after advertisement of the same in a newspaper having general circulation within the State, or in a financial publication published in the City of New York, at least 10 days prior to the occasion set for the sale. The Act then provides that the bonds might be disposed of at private sale, if there are no bids received, or if the bids which were received are rejected. *547 There is a further provision in this Section relating to private sales to Federal agencies, which has no bearing upon the question here discussed. The record before me shows that the Town offered its bonds for sale by causing the publication of an advertisement in the Columbia State more than 10 days prior to the occasion set for the sale, but received no bids at the time at which the bids were returnable; that thereafter it undertook negotiations to dispose of the bonds at private sale. In so doing, it was altogether within its rights. However, these negotiations first resulted in an offer on the part of the concern, ultimately purchasing the bonds, to buy them only if they were additionally secured by a pledge of the net revenues of the water system. When the Town received this offer, it was communicated to counsel retained by the Town to approve the legality of the bonds. Counsel took the position that the Town might not negotiate at private sale for general obligation bonds, additionally secured by a pledge of the net revenues, for the reason that bonds of this particular tenor had never been advertised. On the basis of this advice, the purchasers thereupon agreed to take bonds of the tenor which had been advertised. Such an offer was approved by Council and the transaction was thereupon consummated. However, after the bonds had been delivered and paid for, the purchasers again discussed with the officials of Town Council the desirability of additionally securing the bonds, and the Council, evidently motivated by a feeling that their action in pledging the net revenues to secure their then outstanding bonds, might prevent the incurring of further debt which would utilize the net revenues of the Water System as security, agreed to the new proposal and made the pledge above set forth.
I have concluded that this undertaking was done without consideration and, therefore, is ineffective. Furthermore, I am of the opinion that the construction placed on Section 16 of the Act by counsel advising the Town in the issuance of the bonds was correct. In order to *548 sell bonds at private sale, the bonds must be publicly offered, and it is only when the conditions prescribed by Section 16 exist that private negotiations are authorized. General obligation bonds, additionally secured by a pledge of revenues, were never offered publicly; hence, there was no power in the Town Council to sell such obligations privately. The bonds that were offered were bonds of a tenor altogether different from general obligation bonds additionally secured by a pledge of revenues, and in order to justify a disposition of general obligation bonds, additionally secured by a pledge of revenues, at private sale, they would have had to have been publicly offered. For this reason, I conclude that the pledge was never effective, is not a part of the contract between the Town and its bondholders, and does not stand as a bar to the disposition of the Water System to the Mauldin-Simpsonville-Fountain Inn Water District.
It is, therefore, Ordered, Adjudged and Decreed:
1. That the sale by the Town Council of the Town of Fountain Inn of its water system to the Mauldin-Simpsonville-Fountain Inn Water District, upon the terms and conditions mentioned in this Decree, is lawful and may be carried out.
2. That the attempt of Town Council to pledge the net revenues of the water system to secure its bonds of October 1, 1951, under the circumstances above set forth, is inoperative and of no force or effect.
And, it is so ordered.
December 19, 1952.
PER CURIAM.
The well-considered judgment of the Circuit Court correctly decides the issues presented by this appeal; it is therefore adopted as the opinion of this Court and will be published.
BAKER, C.J., and STUKES, TAYLOR, and OXNER, JJ., and JAMES B. PRUITT, Acting Associate Justice, concur.