## CITY OF MINNEAPOLIS v. REPUBLIC CREOSOTING COMPANY AND ANOTHER.[1]

December 5, 1924.

No. 24,072.

**Construction of contract for purchase of paving blocks.**

1. Defendant contracted to sell and deliver to plaintiff, during the first six months of 1920, all or any part of 42,000 square yards of paving blocks, at such times as ordered by the city engineer. Although in the nature of an option, the city by this contract purchased the right to compel the deliveries contracted for, even though such deliveries were to be called for and determined upon as to time and amount by the city engineer, who as an original matter would have had no right to bind the city by a contract of purchase.

**Surety estopped from asserting contract was invalid.**

2. So far as defendant surety is concerned, the case is within the rule of Bell v. Kirkland, 102 Minn. 213, for the bond sued upon recited the existence of the contract and therefore prevents the surety from asserting its invalidity on account of any defect in its execution.

**Contractor estopped from asserting city engineer's lack of power.**

3. Whether or not the principal contractor is estopped for the

[1]Reported in 201 N. W. 414.

same reason, quaere, but it is held that the contractor, for a valuable and executed consideration moving to it, the benefit of which it retains, having contracted to deliver as ordered by the city engineer, cannot escape liability because of any lack of power in him to contract for the city. The contractor is estopped to make any such claim.

**What controls when conflict between specifications and contract.**

4. The specifications which were a part of this contract were those which had accompanied an older and similar agreement. They provided for daily deliveries of one per cent of the total contract to commence not later than 10 days after notice from the city engineer. The contract itself required deliveries at the rate of 1,500 square yards per day, no preliminary notice being provided for. *Held* that, in this conflict between contract and specifications, the former, being the later expression of contractual assent, must control. Therefore deliveries were properly required at the rate of 1,500 square yards per day. But there is no conflict between contract and specifications as to the 10 days' notice provision. Therefore the specifications control, and deliveries were properly required to begin upon 10 days' notice.

**Performance not excused by car shortage.**

5. There being nothing in the contract excusing defendant's performance for that reason, a general car shortage did not excuse performance by defendant.

**Plaintiff entitled to damages for blocks bought elsewhere.**

6. Upon defendant's default, plaintiff procured paving blocks from other sources, paying no more than the fair market value thereof. It is entitled to recover damages accordingly, notwithstanding the fact that if it had waited some time it might have procured the blocks from defendant under the contract at the contract price. Plaintiff was not compelled to await defendant's convenience.

Action in the district court for Hennepin county to recover $63,530 on a contractor's bond. The case was tried before Buffington; J., who directed a verdict in favor of plaintiff for $52,198.65. From an order denying their motion for judgment notwithstanding the verdict or for a new trial, defendants appealed. Affirmed.

*Shaw, Safford, Putnam & Shaw* and *John H. Ray*, for appellants.
*N. M. Cronin* and *R. S. Wiggin*, for respondent.

STONE, J.

Action on the contractor's bond, against both contractor and surety, for breach of contract for the sale and delivery by defendant, Republic Creosoting Company, to plaintiff of paving blocks. After a directed verdict for plaintiff for $52,198.56, defendants moved for judgment notwithstanding or a new trial and appeal from the denial of that motion.

The contract bears date of December 31, 1919, and recites as consideration the release of the Creosoting Company (hereinafter referred to as defendant), and its surety from all liability under a former and similar contract and bond (for 1919 deliveries), whereunder there had been default by defendant. We start then with the conceded fact that the controlling contract is based upon ample and executed consideration, moving from plaintiff to defendant.

The obligation of defendant, as expressed by the contract, was:

"to sell, furnish and deliver to said second party (plaintiff)   *   *   * during the first six months of the year 1920, in such quantities not exceeding 1,500 square yards per day and at such times as the said City Engineer may order and direct, forty-two thousand (42,000) square yards, or any part thereof at the option of said second party, of 3½ inch yellow pine creosoted wood paving blocks, for the sum and price of $2.10½ per square yard, street measurement, all in strict conformity with the specifications for said paving blocks referred to and included in the 1919 contract hereinbefore referred to"

The 1919 specifications referred to were made a part of the contract, and provided as to deliveries that:

"The blocks shall be furnished in such quantities and at such times as the City Engineer may direct, and if so directed, the contractor shall furnish one per cent of his total contract, computed in square yards, per day, delivery to commence not later than 10 days from notice by the City Engineer."

There was nothing in the contract excusing defendant from punctual performance because of strikes, lockouts, a car shortage or similar hazards beyond the control of defendant.

On April 28, 1920, the city engineer delivered to defendant, four "requisitions for delivery." Each was signed by plaintiff's purchasing agent and was for an authorized paving project. Together they directed delivery of the entire 42,000 square yards covered by the contract, and at the rate of 1,500 square yards per day, commencing May 10. Each requisition contained the necessary shipping directions, referred to the specified blocks as "applying on your (defendant's) contract," and carried this notation, "apply the material listed on your contract with the city of Minneapolis. This is not an order, but only a requisition for delivery on contract."

Upon receipt of these requisitions, defendant informed plaintiff's engineer and purchasing agent that deliveries as required were impossible, but that it was desirous of making them as rapidly as conditions permitted. The asserted impossibility of performance was referred exclusively to a country-wide car shortage. We assume that it did exist and did prevent defendant's compliance with the requisitions. We assume also defendant's willingness and ability to deliver as soon as a car supply enabled it to assemble the raw material, complete the processes of manufacture and get the finished product to Minneapolis. At best, in defendant's case that would have taken some months after May 10, 1920. No part of the blocks was delivered or tendered by defendant. It declined to make any effort to fill plaintiff's requisitions, professing for the reason stated inability to do so. Plaintiff disregarded its offer of deliveries later and, as soon as railroad service permitted, considered the contract irrevocably breached by defendant, procured the blocks elsewhere and at a higher price and commenced this suit for the damage arising from their increased cost.

1. Defendant's first position is that the contract was "merely a contract for an option" and that "unless and until exercised lawfully and in accordance with its terms imposed no obligation upon the Creosoting Company to deliver, or upon the city to take and pay for any blocks whatsoever." Admitting a contract, the argu-

ment is that it is not a contract of sale, binding one to deliver goods and another to take and pay for them; that the latter contract never came into existence because the act required to bring it into being, the contractual assent of the city of Minneapolis, was never, in any lawful fashion, expressed or notified to defendant. The contention depends upon the proposition, urged as controlling by defendant, that its engineer and purchasing agent have no power to bind plaintiff by a contract, such as this, for the purchase of construction materials in large quantities. That is true, for under the charter and ordinances of Minneapolis contracts for the purchase of materials in large quantities must be made or expressly authorized by the city council. In this case, the agreement of December 31, 1919, was so made or authorized, but the city council did not expressly authorize or take any particular action with respect to the requisitions for delivery, defendant's failure to comply with which resulted in this action.

It is clear, however, that four authorized paving projects were under way; that they were under the immediate official and administrative control of the city engineer, one of whose duties was to determine when and how much material was needed, and to direct deliveries accordingly; and finally, and most important, defendant was bound by contract—call it "option" or anything else—to honor orders, under the contract, from the city engineer. Likewise, plaintiff was contractually bound to abide any orders of its engineer for the delivery of blocks under the contract, whether or not it used them, and to pay for the blocks so ordered at the "option" price. There is nothing in statute, charter or ordinance, preventing plaintiff from contracting to accept and pay for, at fixed prices and during a specified reasonable period, such paving blocks as may be ordered, under the contract, by its city engineer.

The argument that contracts cannot be made for plaintiff by its engineer is refined too much by urging, as defendant does, that the engineer cannot determine when to order or how much. The impossible alternative is that the city council would have to sit more or less constantly for the purpose of sanctioning requisitions for ma-

terials needed, day by day, in the numerous public works always under way in any city of truly metropolitan pretensions. .

Of course it is well understood that:

"An option is a privilege given by the owner of property to another to buy the property at his election.   It secures the privilege to buy and is not of itself a purchase.   The owner does not sell his property; he gives to another the right to buy at his election." Western Union Tel. Co. v. Brown, 253 U. S. 101, 40 Sup. Ct. 460, 64 L. ed. 803.

While an option is not of itself a purchase of the property in question, it is literally the purchase *of a right to buy property* if the optionee elects to do so.   Staples v. O'Neil, 64 Minn. 27, 65 N. W. 1083; Gregory Co. v. Shapiro, 125 Minn. 81, 145 N. W. 791; Koehler & Hinrichs Merc. Co. v. Illinois Glass Co. 143 Minn. 344, 173 N. W. 703.   So here the least that can be said of the contract is that plaintiff, for a valuable and executed consideration, *purchased* the right to buy—to obligate defendant to sell and deliver to it—all or any part of the specified quantity of paving blocks.

The basic contract, option or otherwise, as to price, period of delivery, character of material, details of manufacture and all, was made by the city council.   It selected its engineer—it makes no difference that he was a mere administrative official without the right to bind the city by contract—to do the ordering if, when and as materials were needed.   His order was thereby made a contingency upon which a conditional contract to purchase, or an option for a purchase, would become an absolute contract for the purchase of whatever materials he might order; and, even though he had no authority, the contracted for contingency having occurred, both parties are bound.

It is clear, not only that defendant cannot take advantage of any lack of contracting power in the engineer, but also that, if the case were the other way around, the city would be estopped by its own contract to deny his power to order the blocks.   It is not a question of agency, but of the effect of a written contract, properly made by both parties, whereby they have bound themselves to

abide the action of a specified official—to become bound upon a given contingency. The contractually designated official has acted; the contingency has occurred, and we see no reason for permitting either party to escape the obligation so clearly assumed.

The exercise of an option is not necessarily the making of a new contract, although frequently that may be the result. Normally and in essence, the optionee's election to proceed under the option is but the assertion of a right under an existing contract and a step in its execution. If, for example, an option on real estate is attempted to be exercised, but the obdurate optioner has to be subjected to specific performance, it is the contract expressed by the option and not any new or different undertaking that is enforced.

This feature of an option is too much neglected by the argument that a new contract was sought to be made by the orders of the city engineer. It ignores the fact that plaintiff, the city, already had a contract, complete to the last detail, whereby it was entitled to order and to receive paving blocks, and there was no legal obstacle in the way of its exercising that contract right through the agency of an official so appropriate for the purpose as the city engineer. The circumstances hardly permit us to consider that there was no contract until the city engineer acted, or that his action brought about a new contract. Such assertions would apply well enough, if the agreement of December 31, 1919, had been a mere offer of a promise, instead of a complete and binding promise, on the part of defendant. For if it had been a mere offer, instead of a completed, executory contract, the city would not have been bound, and therefore defendant would not have been bound, by any act of the city engineer beyond his lawful power. That is not the case. The agreement was more than an offer of a promise. It was an effectual contract, and its contractual character is not to be impugned, nor the resulting obligation destroyed, by the fact that the rights of plaintiff were to be exercised by an administrative official who, as an original matter, could not have bound plaintiff by such a contract.

2. So far as the surety is concerned, the case might be disposed of under the rule of Bell v. Kirkland, 102 Minn. 213, 113 N. W.

271, 13 L. R. A. (N. S.) 793, 120 Am. St. 621.  There it was held that the recital in a public contractor's bond of the existence of a contract prevented the surety from denying the validity of the contract referred to.  The defense was that the contract was ultra vires, not in the primary sense of its being beyond the power of the municipal corporation, but in the secondary sense that there was an irregularity or defect in the exercise of the power to make the contract.  The recital of the bond was held an estoppel against that defense.

Here the recital is that plaintiff had entered into a written contract with defendant "to sell, furnish and deliver   *   *   *   [42,000] square yards or any part thereof, at the option of said city, of $3\frac{1}{2}$ inch yellow pine creosoted wood paving blocks."  The bond was conditioned for the faithful performance of the contract, and obligated the surety to indemnify plaintiff against damage from a breach by defendant.  Defendant agreed to deliver within the contract limits as ordered by the city engineer.  It has failed to do so. The argument that the surety can escape liability for so obvious a breach by its principal, upon the ground that there was no contract— the surety having formally and contractually recognized that there was a contract—is wholly untenable.  The bond, although collateral to the principal undertaking, is a separate contract.  Its recital of the principal undertaking was an agreement that the contract referred to was a valid contract, binding according to its terms.  That agreement is a term and condition and of the very essence of the obligation of the bond.  To permit the surety to escape all obligation on the plea of the technical invalidity of the contract would be subversive of the intention of the parties, and of the duty of courts to enforce contracts as they are made.

3.  If the surety is estopped by the bond, why not the contractor also?  The bond is the contract of both of them.  Its recital of material conditions should be equally binding on them.  That argument, if made, would carry a good deal of persuasion, but we do not base our opinion upon it so far as concerns defendant, whose argument is, not that the contract of December 31, 1919, was not properly entered into, but that what counsel are pleased to con-

sider the new, unauthorized and different agreement, attempted to be made by the orders of the city engineer and purchasing agent, was unauthorized, and therefore, no contract. But whatever else may be said of the contract of December 31, 1919, plaintiff thereby purchased the right to order all or any part of the specified quantity, and to order it through the agency of its city engineer. What defendant is now doing, under the guise of its contention that the engineer could not bind the city by a contract to purchase, is to argue the very different proposition that he could not bind the city by orders for materials under a contract already made.

Defendant, on the faith of its contract to be bound by the orders of the city engineer—which really were merely administrative determinations of when paving blocks were needed and in what quantities—has reaped the benefit of the cancelation of its liability under the old contract. It has not offered to reassume that obligation. It has profited substantially and, to the extent of the surrender of such liability, plaintiff has been damnified. There is abundant ground therefore to apply the rule that a contractor with a municipal corporation, who has received benefits under a contract, cannot escape liability because of technical impropriety in the manner of its execution. For example, in City of Madison v. American Sanitary Engineering Co. 118 Wis. 480, 95 N. W. 1097, a public contractor attempted to be relieved upon the ground that, although the law so required, the job had not been let publicly and to the lowest bidder or, in the absence of competition, by a two-thirds vote of a city council. It was proven that neither course was adopted. "Conceding that the facts are as claimed," said Mr. Justice Winslow,

"there is a very plain misapprehension here of the application of the principles relied on. Taxpayers whose money is to be spent, or property owners whose land is about to be charged, may challenge the legality of municipal acts or contracts calling for such expenditures on the ground that the proper legal steps have not been taken, but persons who enter into a contract with the city stand in a different position. Such a person cannot even make the defense of ultra vires or total lack of power on the part of the corporation to make the contract * * *. If the defense of ultra

vires cannot be made, it is very evident that the lesser claim of failure to execute a given power in the statutory way must be ineffective."

Without now having anything to say to the different question that would be before us if the contract were wholly beyond plaintiff's power, we do hold that defendant, for an ample consideration which it retains, having contracted to abide the orders of the city engineer, is in no position now to question his authority. That result is easily attainable by applying the doctrine of estoppel. But it follows just as inescapably and more directly the simple proposition of contract law that one must do what he has legally promised to do or abide the consequences. There is no question but that plaintiff had a right to bind defendant, if the latter was so minded, to deliver paving blocks as ordered by the city engineer. Defendant so bound itself. It is too late now for it to argue that, notwithstanding its contractual undertaking to the contrary, the city engineer had no right to order paving blocks, and direct the time and quantities of their delivery.

The proposition that, having entered into a contract with a municipality and received benefits thereunder, a contractor cannot invoke, to his advantage, technical defects in the execution of the contract on the part of the municipality, is well established. In re Worcester County, 102 F. 809 (815), 42 C. C. A. 637; Bell v. Kirkland, supra; Moore v. County of Ramsey, 104 Minn. 30, 115 N. W. 750; City of Marshall v. Kalman, 153 Minn. 320, 190 N. W. 597; St. Louis v. Davidson, 102 Mo. 149, 14 S. W. 825, 22 Am. St. 764; National Bank v. Matthews, 98 U. S. 621, 25 L. ed. 188. Compare City of Fergus Falls v. Fergus Falls Hotel Co. 80 Minn. 165, 83 N. W. 54, 81 Am. St. 249. The rule is well considered in City of Belfast v. Belfast Water Co. 115 Me. 234, 98 Atl. 738, L. R. A. 1917B, 908. It is there said:

"It has been repeatedly held, and we think with good reason, that when a party has accepted the benefits of a contract, not contra bonos mores, he should not be permitted to question the validity of it; that he is estopped."

After the citation of ample authority, the principle is well likened to that which prevents courts from declaring a statute unconstitutional "except at the instance of those whose rights are injuriously affected by the unconstitutional provision."

Here there is an undisputed contract, that of December 31, 1919, clear enough in its meaning. Defendant received a very substantial benefit which it retains, and acknowledged its obligation to perform as required by plaintiff's engineer. It cannot now deny that it was obligated to perform as it promised to perform.

4. We now come to a difficulty of construction caused by a conflict between specifications and contract with respect to delivery. On that subject it is provided in section 5 of the specifications as follows:

"The blocks shall be furnished in such quantities and at such times as the city engineer may direct, and if so directed, the contractor shall furnish one per cent of his total contract, computed in square yards, per day, delivery to commence not later than 10 days from notice by the City Engineer."

The contract itself, the later contractual expression, requires delivery "in such quantities not exceeding 1,500 square yards per day, and at such times as the said city engineer may order and direct." Our task is to determine what the parties meant by the inclusion of these conflicting provisions, the one in the 1919 specifications (by reference a part of the contract), and the other in the contract itself.

The older document specifies for daily delivery one per centum of the total yardage. The newer statement of contractual intent, in the contract itself, substitutes 1,500 square yards. Because it is the later expression it must control.

But how about the time between the placing of an order and the beginning of delivery required thereby? The specifications require notice of at least 10 days. On this point the contract is silent; there is no conflict between contract and specifications, and the latter control. The result is that defendant obliged itself to deliver as ordered, provided it was given 10 days' notice and the rate

of delivery was within the maximum. To hold otherwise would require us to eliminate the "not later than 10 days from notice by the city engineer" provision of the specifications. There being nothing contra in the contract, nothing to indicate that it was to be disregarded, we are not at liberty, by construction, to take it out of the specifications, and thereby relieve defendant from an expressly assumed obligation. Defendant, having contracted to deliver on ten days' notice, is in no position to urge that it was entitled to a longer time. The rule that performance may take place within a reasonable time does not apply where the contract itself fixes the time of performance and there is no legal excuse for a failure of compliance. Furthermore, to apply it here as defendant wants it applied, would wrench severely, if it did not destroy, the condition for delivery "in such quantities * * * and at such times as the city engineer may direct."

5. Defendant's next contention is that there was a legal excuse for the failure of compliance. The argument is predicated upon the general car shortage. There is no doubt that it existed and imposed an insurmountable obstacle to defendant's performance, unless to begin with it had on hand enough material, raw and manufactured, to enable it to begin and maintain deliveries as required. On this phase of the case, defendant resorts to the rule of impossibility of performance, urging that the car shortage created one that was insurmountable.

The weakness of that argument, and it is a fatal one, is that this is not the kind of a situation to which the rule of impossibility of performance is applicable. There was no clause in the contract or specifications which expressly, or by implication, excused performance in case of car shortage or labor trouble. It was competent for the parties so to have conditioned the contract. They did not do so. Defendant's obligation to perform was absolute. We appreciate fully that the manufacture of creosoted wood paving blocks is not a rapid process; that freshly cut, long leaf, southern pine is required; that it takes time to procure and assemble it before the process of manufacture begins, and that manufacture and shipment to consumer take still further time. However, defendant's business

was to manufacture and deliver where and as required the commodity in question. Plaintiff was not its only customer. Supposedly, it was manufacturing and selling paving blocks in large quantities. It had a plant in Minneapolis. It might have conditioned performance upon continued and normal railroad freight service. It did not take that precaution. It must take the consequences, for performance was normally possible and the thing which prevented was a forseeable contingency against which it might have protected itself, and notwithstanding which, it undertook punctual performance. That is the rule of all our cases, e. g.: Cowley v. Davidson, 13 Minn. 86 (92); Stees v. Leonard, 20 Minn. 448 (494). "It is as well settled as anything in the law can be, that 'if a party, by his contract, charge himself with an obligation possible to be performed, he must make it good, unless performance is rendered impossible by the act of God, the law or the other party.'" Paine v. Sherwood, 21 Minn. 225, following Dermott v. Jones, 2 Wall. 1, 17 L. ed. 762; Hokanson v. Western Empire Land Co. 132 Minn. 74, 155 N. W. 1043; Mascall v. Reitmeier, 145 Minn. 214, 176 N. W. 486. The subject is discussed in all its phases in Williston, Contracts, § 1931, et. seq.

6. Finally, we are unable to discover an obstacle to plaintiff's recovery in any failure to do everything it was bound to do to mitigate damages. However harsh may have been plaintiff's insistence upon deliveries according to the strict letter of the contract notwithstanding the acknowledged car shortage, it was certainly at liberty, upon defendant's failure of compliance, to go onto the open market for the needed blocks. It was admitted that during the summer of 1920, the fair market value of blocks of the kind required was $3.20 per square yard. That admission justifies the verdict as to amount. The argument that, if plaintiff had awaited the convenience of defendant it could have gotten the blocks from it at the contract price, is unavailing. When there was so clear a breach of contract of sale as there was here, the purchaser may go into the open market for the goods and hold the seller for the resulting damage. Defendant is not helped by the fact that, in purchasing the blocks from others, plaintiff accepted deliveries some-

what later than those originally undertaken by defendant. What transpired between plaintiff and other contractors, is of no concern to defendant, unless there was a failure of diligence or good faith or an excessive price was paid.

It follows that the order appealed from must be affirmed. It is so ordered.