# ARTHUR K. WURDEMANN AND ANOTHER v. CLIFFORD R. HJELM AND OTHERS.

102 N. W. (2d) 811.

March 18, 1960—No. 37,916.

*Samuel P. Halpern* and *Louis B. Schwartz,* for appellants.

*Cummins, Cummins, Hammond, Cummins & O'Brien,* for respondents.

MURPHY, JUSTICE.

This is an appeal from an order denying plaintiffs' motion for amended findings or for a new trial. The trial court had found that certain agreements entered into between the plaintiffs' assignors and defendant Jesmer Corporation were a lease and option to purchase

and not an agreement for the purchase and sale of an interest in real estate. It further found, contrary to the contentions of the plaintiffs, that the lease and option were effectively terminated for breaches of several covenants contained in the lease and that the termination of the lease was not a result of an unlawful conspiracy among the defendants to defraud plaintiffs. This is also an appeal from an order denying a request to permit certain testimony to be introduced or for a new trial on the basis of certain newly discovered evidence not available at the time of the trial.

This case involves a number of complicated agreements and transactions. It is unnecessary to record here in detail all the facts developed in the many hundreds of pages of testimony in the official record. Briefly summarized, the salient facts are these: On December 31, 1954, the Jesmer Corporation and defendants Clifford R. Hjelm and David R. Hjelm entered into two agreements denominated "INDENTURE OF LEASE" and "option." Under the first agreement the Hjelms leased from the Jesmer Corporation the Piedmont Apartments located in St. Paul for a period of 10 years from January 1, 1955, at a monthly rental of $4,500. The lessor agreed to pay all personal and real property taxes, except that if they exceeded $4,700 in any year the lessees were to pay the excess. The lessor agreed to carry public liability insurance in specified amounts and $500,000 of fire and tornado insurance on the property, but the lessees were to reimburse the lessor for premiums in excess of $1,900 in any year. In the event of damage by fire rendering the premises unfit for the conduct of the lessees' business the lease could be terminated by either party, unless the damage could be repaired within 6 months, in which case the lessees were to repair the premises and the lessor's insurance proceeds were to be made available for those expenses. In the event of total loss the land, independent of buildings, was to be conveyed to the lessees. Covenants in the lease provided that the lessees would not sublet the property without the consent of the lessor, except in units in the ordinary course of their business;[1] that the lessees would not permit

---

[1]It was apparently the understanding of the parties that this covenant prohibited assignment of the lease.

mechanics liens to attach to the premises without promptly discharging them or furnishing to the lessor a sufficient bond to protect the premises from the liens; that at least one of the two lessees would personally occupy the premises during the entire term of the lease, unless prevented from doing so by causes beyond his control; that no defective condition would be allowed to exist on the premises in violation of any city ordinance; and that if the lessees failed to keep or perform any of the lease covenants, the lessor could elect either to reenter without working a forfeiture of the rents to be paid and covenants to be performed under the lease or to terminate the lease on written notice to the lessees.

Under the second agreement the lessees were given an option to purchase the leased premises for $100,000, provided all the terms of the lease had been fully complied with. In return for this option the lessor was given title to certain contracts of an agreed value of $20,000, which the Jesmer Corporation sold for $17,000. These two agreements were filed in the office of the registrar of titles, although no registration tax was paid on filing.

There was testimony by Mr. J. Lisle Jesmer that in 1954, the year prior to the lease, the gross rental receipts from the Piedmont were $81,645.98, and that the expenses, excluding insurance and taxes, were $38,302.21. There was also testimony by Clifford Hjelm that his "understanding" was that the rental receipts were $7,500 to $8,000 per month (substantially more than the actual receipts) and that when he entered the lease agreement he believed he and his brother could operate the Piedmont more efficiently than the Jesmer Corporation had so that they could make a substantial profit over the monthly rentals and expenses. The value of the Piedmont was estimated by various witnesses at $400,000 to $500,000.

The Hjelms lived in and operated the Piedmont during 1955 and 1956. On their Federal and state income tax returns for 1955 the Hjelms listed the $4,500 monthly payments to the Jesmer Corporation as rent expense, and the company listed those receipts as rental income. During 1956 the company had difficulty collecting rents from the Hjelms and several of the checks received from them were returned

marked "N.S.F." Since December 1956 the rent had never been paid on time. The Jesmer Corporation commenced separate unlawful detainer actions for nonpayment of rent for the months of December 1956, February 1957, March 1957, and April 1957.

During 1957 Jesmer and Clifford Hjelm held some unsuccessful negotiations intended to change the lease and option agreements into a contract for deed.

There was evidence that by April 1957 the lessees were notified by the city architect's office that conditions existed on the premises in violation of the city's codes. During 1957 seven mechanics liens were filed against the Piedmont, although only two of these were filed before and remained undischarged on June 3, 1957, when the respondent, Jesmer Corporation, commenced an unlawful detainer action.

On April 16, 1957, the Hjelms entered into a written agreement with Arthur K. Wurdemann under which the Piedmont lease and option were assigned to the Wurdemann-Hjelm Corporation. This agreement expressly provided that the operation of the Piedmont would be in the Hjelms' name. Following this agreement the Hjelms moved out of the Piedmont on April 17, 1957. Since that time the Hjelms have transferred their stock in the Wurdemann-Hjelm Corporation to Arthur Wurdemann, and they no longer have any interest in the Piedmont. Mr. Jesmer learned of the assignment in May 1957 and obtained a copy of it in June of that year.

On June 3, 1957, the Jesmer Corporation brought an unlawful detainer action in the Ramsey County justice court for breaches of lease covenants. The Hjelms, the Wurdemann-Hjelm Corporation, and Arthur Wurdemann were each named as defendants. On June 29, 1957, the Jesmer Corporation entered an agreement with Clifford Hjelm that if Hjelm would provide a buyer for the Jesmer Corporation's vendor's interest in the Piedmont Apartments part of the money received would be used to discharge certain personal obligations of Hjelm and also that if—but only if—the company were successful in repossessing the Piedmont Apartments Hjelm would be discharged from repaying such sums. Pursuant to this agreement the Jesmer Corporation also received a copy of the assignment agreement of

April 16, 1957, between the Hjelms and Wurdemann. Mr. Jesmer testified, however, that the agreement was not made to induce Clifford Hjelm to testify falsely before the justice court. He did not know prior to the trial that Hjelm would testify.

The unlawful detainer action was tried in the justice court of Judge R. F. Ferguson, justice of the peace, before a jury, and resulted in a verdict and judgment for the Jesmer Corporation. A writ of restitution for return of the Piedmont Apartments to the Jesmer Corporation was ordered.

The plaintiffs here failed to appeal from that judgment within the time fixed by statute. In The Jesmer Co. v. Wurdemann-Hjelm Corp. 250 Minn. 485, 85 N. W. (2d) 207, this court made absolute a writ of prohibition restraining the municipal court from entertaining any appeal from the justice court judgment.

The plaintiffs in the present action then sought a writ of prohibition to restrain the justice court from enforcing the writ of restitution entered in the action. This court discharged the writ and held that the justice court had jurisdiction of the unlawful detainer action. The Jesmer Co. v. Wurdemann-Hjelm Corp. 250 Minn. 574, 85 N. W. (2d) 192.

On October 7, 1957, after the justice court judgment had been obtained, the Jesmer Corporation transferred a vendor's interest in certain real estate to Clifford Hjelm and agreed to discharge certain obligations of his. Hjelm, in return, released the company from its obligations under the June 29 agreement; agreed to pay certain financial obligations upon which liens could be filed against the Piedmont Apartments; and agreed to pay to the company rentals collected from Piedmont tenants during the last weeks of September 1957.

To outline the numerous claims and cross-claims asserted in the four consolidated actions would unduly extend this opinion and contribute nothing to an understanding of the determinative issues. It is sufficient to say that plaintiffs assert that they are the owners of the Piedmont Apartments; that they are unlawfully denied possession; and that they should have judgment declaring them to be the owners of the property and an accounting for rents collected by the Jesmer Cor-

portion since it repossessed the property. They further ask that a temporary injunction issue enjoining the defendants from disposing of the property and that a receiver be appointed. They ask for a declaratory judgment establishing that the lease and option agreement were in fact a purchase and sale agreement for an interest in real estate. Defendant Jesmer Corporation claims that the plaintiffs are indebted to it for $18,000 as rent and it asserts a further claim in the amount of $25,000 alleging the plaintiffs have permitted waste on the property, have removed personal property, and have damaged the premises.

The trial court by its findings concluded: (1) That the agreement of December 31, 1954, between the Jesmer Corporation and the Hjelms was a lease and an option to buy at the termination of the lease; (2) that the terms of the lease were breached by assignment without consent of the lessor; by permitting liens to be filed against the property; by delinquency in rental payments; by failure to comply with city ordinances in making repairs and maintaining electrical installations; and by the removal of the lessees from the premises; (3) that the Jesmer Corporation had not waived any of such breaches and was entitled to restitution of the premises; (4) that the justice court had jurisdiction of the unlawful detainer action and its judgment granting restitution of the premises terminated the lease; (5) that there was no conspiracy between the defendants to defraud the plaintiffs; (6) that the Jesmer Corporation is in lawful possession of the premises and plaintiffs are not entitled to an accounting from the Jesmer Corporation. The court did not hear all of the evidence with reference to the financial transactions between the Hjelms and Wurdemann. The parties agreed that a determination of those issues would await the decision relative to the construction of the original lease and option and a determination on the issue of conspiracy.

■ The plaintiffs contend that the lease and option agreements between the Jesmer Corporation and the Hjelms can be cancelled only by notice pursuant to M. S. A. 559.21, which provides in part:

"When default is made in the conditions of *any contract for the conveyance of real estate or any interest therein,* whereby the vendor has a right to terminate the same, he may do so by serving upon the

purchaser, his personal representatives or assigns, either within or without the state, a notice specifying the conditions in which default has been made, and stating that such contract will terminate 30 days after the service of such notice unless prior thereto the purchaser shall comply with such conditions and pay the costs of service. *Such notice must be given notwithstanding any provisions in the contract to the contrary,* * * *.

\* \* \* \* \*

"If, within the time mentioned, the person served complies with such conditions and pays the costs of service, the contract shall be thereby reinstated; but otherwise shall terminate." (Italics supplied.)

The plaintiffs argue that the lease and option agreements simultaneously entered into between the Jesmer Corporation and the Hjelms constitute a contract for the conveyance of an interest in the Piedmont Apartments within the meaning of the statute. In determining the validity of this argument we must consider the transaction as a whole in light of the then-existing circumstances in order to ascertain the true nature of the relationship that was thereby created. Beecher v. Spain, 140 Minn. 255, 167 N. W. 793. Neither the form of the instruments creating the relationship nor the names which the parties have given them are to govern our determination. Beecher v. Spain, *supra*; Johnson v. Fitzke, 234 Minn. 216, 48 N. W. (2d) 37; 12 Am. Jur., Contracts, § 27. The essential inquiry is after the nature of the obligations imposed on the parties.

■ The respondent contends that the agreements must be considered to create an option only, to which § 559.21 is inapplicable, since there is no obligation on the lessees-optionees to pay the $100,000 and purchase the Piedmont at the end of the lease term. The authorities relied upon are Womack v. Coleman, 92 Minn. 328, 100 N. W. 9, and the following cases approving the rule of that decision: Pike Rapids Power Co. v. Minneapolis, St. P. & S. S. M. R. Co. (8 Cir.) 99 F. (2d) 902; Libby v. Parry, 98 Minn. 366, 108 N. W. 299; Ballard v. Friedman, 151 Minn. 493, 187 N. W. 518; and Moore v. Allen, 109 Minn. 139, 123 N. W. 292. The Womack case in-

volved a contract under which one party agreed (92 Minn. 333, 100 N. W. 11)—

"* * * that he will convey, or cause to be conveyed, the premises to the second party, by warranty deed, upon full performance by the second party [of payment of the stipulated price in the manner designated in the contract]. While the first party is bound to furnish the abstract, tender a good title, and cause the premises to be conveyed by a sufficient warranty deed, the second party was not obligated to make the remaining payments and accept the conveyance, even though a good and sufficient title be tendered."

The court held that contract to be an option not subject to the predecessor statute of § 559.21.

The plaintiffs' reply brief states that the principal issue is whether the lease and option "constituted an agreement to sell or were merely a lease and option." Viewing the transaction in retrospect counsel for the plaintiffs, by a computation based upon gross income derived from the property less rentals and other expenses to be paid by the tenant under the terms of the lease, concludes that the tenant would be left with about $33,000 from which to pay an annual rental of $54,000 and argues "that no sane person would enter into a lease with that record, and pay $20,000 for that privilege, unless it had been agreed that part of the monthly payments were to be applied on the purchase price, and therefore added to the $100,000 designated as the purchase price under the option."

This argument boils down to the proposition that a court must by force of the character and effect of the agreements conclude that they constitute, in substance if not in form, a contract for the purchase of an interest in real estate. Plaintiffs claim that the total effect of the agreements indicates that the monthly payments were not in fact rental payments but installments on a purchase price and that as these payments continued during the term of the transaction the lessees were building up an equity in the property which would result in an economic compulsion which would necessarily require them at the termination of the agreement to exercise the option by the payment of $100,000

at which point they would acquire a property estimated in value at from $400,000 to $500,000. The difficulty with accepting this argument is that nowhere in the record aside from the option agreement can we find any evidence of a purchase price considered or agreed upon by the contracting parties nor have the plaintiffs furnished us with any authority to support the conclusion they ask us to reach. The plaintiffs rely primarily on In re City and County of San Francisco, 195 Cal. 426, 233 P. 965, and Mahoney v. City and County of San Francisco, 201 Cal. 248, 257 P. 49. It is readily apparent from an examination of these authorities that the transactions involved related to the purchase and sale of real estate. To circumvent constitutional restrictions with respect to the purchase of real estate by California municipalities, the parties resorted to the mechanics of a lease and option to accomplish the acquisition of property. The California court correctly held that an agreement between parties to characterize the instrument as a lease cannot change its true character, and the evident intent and purpose of the makers as disclosed by the terms of the instrument must control.

We are asked by the plaintiffs to give an interpretation to the agreements before us which would ignore the expressed intention of the parties as set forth in the language contained in the agreements. It is well recognized that a court will not resort to construction where the intent of the parties is expressed in clear and unambiguous language but will enforce and give effect to the contract according to its terms, in the absence of fraud or other grounds affecting enforcement according to its terms.[2]

If we apply the well-recognized rules of construction we must necessarily come to the conclusion that the documents in question are in

[2]Anderson v. Twin City Rapid Transit Co. 250 Minn. 167, 84 N. W. (2d) 593; Tynan v. KSTP, Inc. 247 Minn. 168, 77 N. W. (2d) 200; Phil G. Ruvelson, Inc. v. St. Paul F. & M. Ins. Co. 235 Minn. 243, 50 N. W. (2d) 629; Pierce v. Grand Army of the Republic, 224 Minn. 248, 28 N. W. (2d) 637; Oleson v. Bergwell, 204 Minn. 450, 283 N. W. 770; Union Sewer Pipe Co. v. Olson, 82 Minn. 187, 84 N. W. 756; 4 Dunnell, Dig. (3 ed.) §§ 1816, 1817, 1831.

fact a lease and an option to purchase and nothing more. The plaintiffs do not contend that there is any ambiguity or uncertainty in the terms of these documents. We could only hold otherwise by ignoring the clear terms of these documents.

Among the numerous cases dealing with this issue is Vogt v. Ganlisle Holding Co. 217 Minn. 601, 15 N. W. (2d) 91, which case has to do with an earlier chapter in the strange history of this particular property.[3] Although it was not squarely dealt with there, the court had before it the same issue which is presented in this case. We there said that (217 Minn. 605, 606, 15 N. W. [2d] 93, 94): "Plaintiff was not obligated to purchase the property but was afforded an opportunity and privilege of doing so should he desire to comply with the conditions by a time certain." Citing various authorities we pointed out that an option is merely a privilege given by the owner of property to another to buy the property at his election. "It secures the privilege to buy and is not of itself a purchase. The owner does not sell his property; he gives to another the right to buy at his election." See, City of Minneapolis v. Republic Creosoting Co. 161 Minn. 178, 183, 201 N. W. 414, 416; Ferch v. Hiller, 209 Minn. 124, 295 N. W. 504; Martin v. Walker, 84 Minn. 8, 86 N. W. 467; Western Union Tel. Co. v. Brown, 253 U. S. 101, 40 S. Ct. 460, 64 L. ed. 803; 1 Dunnell, Dig. (3 ed.) § 5404; 20 Id. § 10016; 12 Am. Jur., Contracts, § 27.

An option to purchase land does not before acceptance vest in the holder of the option an interest in the land. It appears, however, that there are some authorities which hold that because an option may be assigned and transferred and the optionee may have it enforced by specific performance it constitutes an interest in land.[4] In Knight v. Chamberlain, 6 Utah (2d) 394, 315 P. (2d) 273, it was held that a

[3] It appears that in 1940 a mortgage was foreclosed on the Piedmont Apartments and sold at sheriff's sale for $11,000 although the property then had a market value of $100,000.

[4] This appears to be on the theory that it gives rise to a contingent equitable interest analogous to an executory devise. See, 26 Harv. L. Rev. 747; 10 Mont. L. Rev. 70.

valid option to purchase is an interest in real estate within the meaning of the statute of frauds requiring such options to be in writing. We held to the contrary in Shaughnessy v. Eidsmo, 222 Minn. 141, 145, 23 N. W. (2d) 362, 365, 166 A. L. R. 435, where we said that a contract conferring an option to purchase vests in the optionee "only a right *in personam* to buy at his election."

■ A contract of sale, on the other hand, must be bilateral in its obligation and if the contract binds one party to sell and the other party to purchase the property for a stipulated price then it is a contract of sale and purchase, the minds of the parties having met on the proposition and both having assented thereto; but if it gives to the second party the mere privilege of buying the property if he chooses, it is an option. McCreight v. Girardo, 205 Ore. 223, 228, 287 P. (2d) 414. In Zora Realty Co. v. Green, 60 N. Y. S. (2d) 440, 445, it was said that a contract of purchase and sale is distinguished from an option in that a purchaser under the contract has not only the right to purchase but is obligated to do so.[5]

Of persuasive force in the consideration of this issue is the fact that the parties themselves considered the agreement a lease and option. The lease and option were filed by the lessees with the registrar of titles as a lease and option; the mortgage registry tax which would be required for filing a contract for deed was not paid. Of no small significance is the fact that the lessees deducted the rental payments as expense in their income tax return while the lessor reported the rent as income in its return. Moreover, it should be pointed out that before the lease was cancelled the lessees made efforts to have the lease and option placed on a contract for deed basis. The parties referred to the documents as a "lease" and an "option." During the course of five unlawful detainer proceedings, the instruments were treated as such by the parties. The plaintiffs' answer in the unlawful

---

[5]See, also, Johnson v. Kruse, 205 Minn. 237, 285 N. W. 715; Oleson v. Bergwell, 204 Minn. 450, 283 N. W. 770; State v. Crum, 70 N. D. 177, 292 N. W. 392; Cole v. Haynes, 216 Miss. 485, 62 So. (2d) 779, 33 A. L. R. (2d) 1378; 55 Am. Jur., Vendor and Purchaser, § 29; Annotations, 3 A. L. R. 582 and 87 A. L. R. 566; 20 Dunnell, Dig. (3 ed.) § 10016.

detainer action in justice court admits occupancy under the terms of a lease, and on at least one check for rental payment given by the plaintiff there was typed in above the line provided for Jesmer Corporation's signature a receipt for "rent" under the "lease."

We are of the view that the trial court was correct in holding that the documents constituting the agreement for lease and option did not constitute a contract for purchase of an interest in real estate.

■ It is next contended by the plaintiffs that the defendants Clifford Hjelm and the Jesmer Corporation conspired to defraud plaintiffs of their interest in the Piedmont Apartments. The trial court found against the plaintiffs on this issue. The plaintiffs now contend that the finding is in error. From an examination of the record as it bears upon the question of the alleged conspiracy to defraud it may be said that at first blush the acts and agreements of Jesmer and Clifford Hjelm suggest that they were salvaging their own interests at the expense of Wurdemann. An examination of the evidence as a whole, however, supports the conclusions of the trial court,[6] who after a fair

---

[6]In an appraisal of Jesmer's situation the trial court pointed out: "Jesmer had been put to the necessity of several unlawful detainer actions to collect rent. He could justifiably look forward to possibly 50 to 75 more over the next seven and a half years. Violations of municipal ordinances had not been corrected or remedied. Creditors were pressing for payment for work and materials furnished. Creditors had threatened to, and * * * actually did, replevy appliances used by various tenants. Rents of the tenants were garnished. Proceedings were about to be commenced to provide for a receivership to operate the business. Jesmer could justifiably foresee that he would soon suffer the loss of, or damage to, a substantial, successful going business. Restitution was the only procedure left for him. He commenced his unlawful detainer action early in June, alleging that Wurdemann or the Wurdemann-Hjelm Corporation has some interest or claimed interest in and to the lease. He had not yet learned of the full contents of the April 16th agreement * * *. Finally, on June 29th or shortly before, he agreed to the terms of * * * [the agreement of June 29] in return for the full contents of * * * [the April 16th agreement].

"On that date (June 29th) assuming he would get the business back, he realized that he would be obligated to pay substantial bills which Wurdemann, the Hjelms and the Wurdemann-Hjelm Corporation had incurred.

and careful review of the evidence decided that what transpired between Clifford Hjelm and Jesmer involved nothing more than what they had a legal right to do.[7]

It is an established rule that findings of fact based on conflicting evidence will not be disturbed on appeal unless manifestly and palpably contrary to the evidence as a whole. Since the lower court is the trier of fact, its findings on disputed questions are entitled to the same weight as a jury verdict and will not be upset merely because this court might view the evidence differently. 1 Dunnell, Dig. (3 ed.) § 411. We are of the view that the evidence fairly sustains the findings of the trial court on the question of conspiracy to defraud and they must be affirmed on that issue.

■ The plaintiffs further argue that the judgment of the justice of the peace was obtained by extrinsic fraud and should therefore be set aside and held void. It is unnecessary for us to labor this point

---

There was no evidence that Clifford Hjelm could ever pay the bills. Having received a copy of * * * [the April 16th agreement], Jesmer knew that Wurdemann was liable for those bills. On June 29th Jesmer in effect told Clifford Hjelm that if he could sell one of Jesmer's contracts for deed, the proceeds would be applied on the Piedmont delinquent accounts, and further, that if Jesmer recovered possession of the Piedmont, the Hjelms would be relieved of the bills still owed, set forth in * * * [the April 16th agreement], which on June 29th amounted to a balance of approximately $23,000. On October 7th, after Jesmer took over the operation of the business, he and Clifford Hjelm entered into an agreement * * *, wherein the rights of the Hjelms were finally terminated in and to the Piedmont, and a further attempt was made to balance their accounts. Again, we must keep in mind that when * * * [the agreements of June 29 and October 7] were made, Jesmer was obligated to pay the delinquent accounts in the sum of approximately $23,000; Hjelms displayed no ability or possibility of making payment; and, though done in violation of the terms of the lease, Wurdemann and the Wurdemann-Hjelm Corporation, then owned solely by Wurdemann, had assumed ownership of the lease and the entire delinquent obligations. It could be said that the agreements were not prudent on the part of Jesmer, but they certainly are not, standing alone, proof of a conspiracy between Jesmer and the Hjelms."

[7]Harding v. Ohio Cas. Ins. Co. 230 Minn. 327, 41 N. W. (2d) 818.

further than to say that a judgment in favor of the landlord is conclusive between the parties as to the existence and validity of the lease, the occupation of the tenant, and the other facts alleged in the complaint which forms the basis of the unlawful detainer action. Here the complaint supporting the unlawful detainer action alleged various breaches of the lease including faulty electrical installations in violation of the city ordinances, permitting mechanics liens in amounts of $667.92 and $880.83 to attach to the leased premises, that the lessees vacated the premises in violation of the agreement to personally occupy the property during the full term of the lease, that the lease was assigned to the plaintiffs in violation of its terms, and that the plaintiffs refused to allow the lessor access to the premises for the purpose of examining and inspecting the same. In Ferch v. Hiller, 210 Minn. 3, 7, 297 N. W. 102, 104, this court considered the legal effect of a judgment in an unlawful detainer action for the restitution of real property and held that the judgment had a res judicata effect on subsequent litigation between the same parties. We said:

"A judgment of restitution is conclusive not only of the right of possession but the facts upon which such right rested."

Accordingly the district court in this case was correct in considering as conclusive the justice court's determination that the lease covenants had been breached and that the breaches had not been waived by the lessor. Any challenge of those allegations would have to be made in an appeal from the judgment and the plaintiffs failed to take such an appeal.

■ The plaintiffs further argue that the judgment granting a writ of restitution in the justice court proceeding was not effective to destroy their rights under the option.

The option to purchase in the case before us is conditioned upon the performance by the lessees of "all of the terms and conditions" of the lease which had a date of expiration of December 31, 1964. Where as here the lease and option agreements constitute a part of one entire contract, the breach of the lease amounts to a failure of consideration for the accompanying option to purchase, so that when

the lease fails because of a breach of the covenants by the lessees the accompanying option must fail with it. The contract together with the option expired upon reentry by the lessor. London v. Tebo, 246 Mass. 360, 141 N. E. 234, 29 A. L. R. 1037. Where the option gives the lessee the right to purchase during the term of the lease, the right must necessarily be exercised during the life of the lease. As was said in Thompson v. Coe, 96 Conn. 644, 650, 115 A. 219, 221, 17 A. L. R. 1233, 1237:

"* * * No owner of premises would understandingly agree that a lessee should have the privilege of purchasing the premises during the term of a lease long after the lease had been forfeited. An agreement of that character would encumber the premises and in all likelihood prevent a sale or lease, or the making of improvements upon the owner's own premises."

In the case before us the agreement to abide by the provisions of the lease was made a condition precedent to the option to purchase. The right of the lessees to purchase the property depended upon the fulfillment of all of the covenants and provisions of the lease. Until they had paid the rent and complied with the other covenants of the lease they had under the contract no right of purchase. Crystal Lake Cemetery Assn. v. Farnham, 129 Minn. 1, 151 N. W. 418; Hafemann v. Korinek, 266 Wis. 450, 63 N. W. (2d) 835; 32 Am. Jur., Landlord and Tenant, § 309; 51 C. J. S., Landlord and Tenant, § 83.

The plaintiffs moved for a new trial on the basis of newly discovered evidence concerning the fact that since the action had been tried the witness Clifford Hjelm had been convicted of making false statements in applications for loans to the Federal Housing Authority. The plaintiffs contend the court erred in denying this motion. It is well settled in Minnesota that "A motion for a new trial on the ground of newly discovered evidence is addressed to the sound discretion of the trial court"[8] and the court's discretion is to be exercised sparingly.[9] In Briggs v. Chicago G. W. Ry. Co. 248 Minn. 418,

[8]Austin v. Rosecke, 240 Minn. 321, 326, 61 N. W. (2d) 240, 244.
[9]Schiro v. Raymond, 237 Minn. 271, 54 N. W. (2d) 329.

427, 80 N. W. (2d) 625, 633, this court also said that "if such [newly discovered] evidence is merely cumulative, contradictory, or impeaching of evidence adduced during the trial, a denial of a new trial is not an abuse of discretion." In the instant case the district court said in its memorandum:

"\* \* \* While this criminal proceeding in federal district court should and does have a bearing on the weight to be given to the testimony of such a person, the Court was cognizant of some of those proceedings at the time of trial, and it is now pointed out that the conclusion reached or arrived at by the Court was upon a full review of all of the evidence and all of the testimony of all of the parties, and the Court need not reiterate here the basis or reasons for its findings and conclusions.

"Under the circumstances the Court feels that it cannot change its position because of a conviction of the defendant Hjelm for said violations."

It should be emphasized that this was not a jury trial and that the judge was, therefore, in a peculiarly good position to determine the probable effect of the newly discovered evidence on the findings of fact. Considering the nature of the new evidence offered and the careful consideration given to it by the district court, we cannot conclude that the court's refusal was a denial of a legal right or a manifest abuse of judicial discretion. Austin v. Rosecke, 240 Minn. 321, 61 N. W. (2d) 240.

Affirmed.